[No. S034473. Dec. 13, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
CHRISTIAN ANTONIO MONTERROSO, Defendant and Appellant.

744

COUNSEL

Jerry D. Whatley, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood, Garrett Beaumont and David Delgado-Rucci, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BAXTER, J.—An Orange County jury convicted defendant Christian Antonio Monterroso of the first degree murders of Tarsem Singh and Ashokkumar Patel; the attempted willful, deliberate and premeditated murder of Allen Canellas; two counts of burglary; three counts of robbery; and two counts of false imprisonment by violence; all by use of a firearm. (Pen. Code, §§ 187, subd. (a), 211, 236, 459–460, subd. (b), 664, subd. (a), 12022.5, subd. (a).)[1] The jury found true the burglary-murder and robbery-murder special circumstances as to each murder and a multiple-murder special circumstance. (§ 190.2, subd. (a)(3), former subd. (a)(17)(i) and (vii).) After a penalty trial, the jury returned a verdict of death. The court denied defendant's motions for new trial (§ 1181) and to modify the penalty verdict (§ 190.4, subd. (e)) and sentenced defendant to die.

This appeal is automatic. We affirm the judgment.

I. BACKGROUND

In the early morning hours of November 21, 1991, defendant Christian Antonio Monterroso robbed and murdered Tarsem Singh, a clerk at the Circle K Market on West Vermont Street in Anaheim, and Ashokkumar Patel, a clerk at Hanshaw's Liquor Store on nearby Lincoln Avenue. Each man was shot and killed with a .45-caliber automatic pistol, which police recovered later that day at defendant's apartment. Police also recovered personal property belonging to Singh and Patel in defendant's bedroom.

A. *The Murder of Tarsem Singh*

Defendant started drinking beer with Felipe Lopez, 16-year-old William Galloway, and a man named Fabian late in the afternoon of November 20,

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1991, at the apartment where defendant lived with Galloway and his mother. The men also ingested some cocaine. Lopez observed that defendant had a gun in his waistband. Later in the evening, the adults went to a bar and a liquor store and returned to the apartment complex. A little before midnight, defendant left again, this time by himself.

Sometime after midnight, Gonzalo Chavez saw defendant outside the Circle K Market, which was about five blocks from the apartment complex. Defendant followed Chavez into the store. Chavez was about to buy cigarettes and gum when defendant pulled out a gun and demanded money from him and from the store clerk, Tarsem Singh. Defendant also asked Chavez for his car keys, but Chavez said they were in the car. Defendant cursed Chavez and pushed him and Singh towards the bathroom at the back of the store. Defendant said he would kill Chavez if Chavez came out. When Chavez pleaded with defendant not to kill him and pushed the gun away, defendant fired at the floor. Defendant then fired three or four shots at Singh, who was trying to get up from the floor.

When the store bell rang to indicate someone else had entered the store, defendant returned to the front. A short time later, defendant led another Hispanic male into the bathroom. Defendant demanded car keys from his prisoners and then took the other Hispanic male out of the bathroom. At some point, defendant told Chavez and the other Hispanic male, "I won't harm you because we're the same race, but don't point a finger at me." When defendant was not looking, Chavez hid in the ice machine. Meanwhile, more people came into the store, and defendant demanded money from each of them and told them to take off their clothes.

Carlos Chacon entered the store to find defendant pointing a gun at another man's head. Defendant led Chacon and the other man to the bathroom and told Chacon to lie on top of Singh, who was bleeding from his gunshot wounds. Before Chacon could do so, defendant looked at Singh and said, "You're still alive son of a bitch." Defendant shot Singh twice more, adding, "This proves I am not playing games." Defendant brought Chacon to the front briefly to help him look for money and then led him back to the bathroom.

When Rodrigo Pelayo and his brother arrived at the Circle K, defendant was holding a Hispanic male by the hair and had a gun to the man's head. Defendant ordered the Pelayos to put their money on the counter and to take off their clothes. A few seconds later, three to five more Hispanic males came in, and defendant told them to take off their clothes and put their money on the counter. He told this new group he was not "kidding around. I already have dead man in the back." Defendant ordered the group into the bathroom and shut the door.

A few minutes later, Allen Canellas arrived. Canellas was homeless and a panhandler and a drug addict, but Singh, the Circle K clerk, had given him some corn dogs and soda a few hours earlier. Canellas considered Singh to be "a nice man." When Canellas entered the store, he found money on the counter and clothes piled up in front. He called out to Singh, but Singh did not answer. Instead, defendant came to the front of the store and asked, "Can I help you?" Canellas saw defendant had a gun and fled. Defendant fired as Canellas left through the glass door. Canellas felt the bullet whiz by his ear, kept running, and called 911. Meanwhile, another customer, this time an African-American male, entered the store and was ordered into the bathroom.

The police arrived at the Circle K at 12:34 a.m. The glass door in front was shattered. There were two piles of clothing in the front and a .45-caliber casing on the floor. Singh lay dead on his left side in a pool of blood in the back of the store. He had been shot six or seven times.

Eight people were in the bathroom. All were upset and frightened. The seven Hispanic males were naked from the waist up. The eighth, an African-American male, was dressed but said that his car had been stolen. The car was later recovered near defendant's apartment.

A Circle K representative estimated that $14.09 was missing from the cash register.

Later that day, Rodrigo Pelayo and Carlos Chacon each identified defendant as the perpetrator of the robbery and murder. They also identified defendant in court. Canellas's description of the perpetrator on the night of the shooting was consistent with defendant's appearance that night.

## B. *The Murder of Ashokkumar Patel*

While defendant was at the Circle K, Lopez and Galloway went to a bar. Defendant was already home when they returned. Around 1:30 a.m., the three left in Lopez's car to look for cocaine but were unsuccessful. At defendant's suggestion, they stopped at Hanshaw's Liquor Store on West Lincoln Avenue on the way home. Defendant directed Lopez to park the car on the street (instead of in the parking lot) and went inside. Lopez observed that defendant still had his gun.

Defendant returned about 10 minutes later. He was carrying two 12-packs of beer and told Lopez to drive home. When they arrived, Lopez saw defendant counting money in the bedroom, but it did not look like much.

Anaheim police responded to a report of a burglary at Hanshaw's at 4:16 a.m. When they arrived, they heard a faint voice behind the counter. The

clerk, Ashokkumar Patel, had been beaten and shot in the back but was still alive. Patel said he had been robbed and shot by a short Mexican male. Around $90 was missing from the register.

Police set up surveillance outside defendant's apartment later that day. Galloway's mother, Jean Brock, had found defendant's gun and hid it. When defendant arrived home around 10:00 p.m., he asked Brock, who was on the phone with the police, where his gun was. Following police instructions, Brock told defendant to leave. Defendant was arrested by police outside the apartment. Brock received a $500 reward for her assistance.

The 11 casings from the Circle K and the single casing from Hanshaw's had come from the .45-caliber semiautomatic pistol found at defendant's apartment. Police also found a .45-caliber magazine hidden in the stereo speaker in defendant's bedroom and a .45-caliber casing under the mattress. Singh's driver's license and other identifying documents were found in a wallet underneath an end table in the living room. A Citibank card with Patel's picture and other identification were found in a dresser drawer in the bedroom defendant shared with Galloway. An Indian religious medallion and some Indian currency were on top of the dresser.

Patel died 11 days later of multi-organ system failure caused by the bullet wounds. He also suffered blunt force trauma that caused bleeding into the brain.

## C. *Penalty Phase*

The prosecution presented victim impact evidence through the testimony of the victims' relatives. Ashokkumar Patel was remembered as a very generous person and a devoted son, husband, and father to his two children. Because of Indian custom, his wife had never had to worry about earning a living. She did not speak English and was now helpless. Tarsem Singh, who was only 28 years old when he died, was a hardworking person and a positive role model for the younger members of the family. His murder caused his family to split apart: his mother and two brothers returned to Fiji, while his father, who was still unable to work, remained in the United States with Tarsem's other brothers.

The prosecution presented additional evidence of defendant's conduct involving force or threats of force.

On the evening of March 8, 1988, defendant confronted Susan Selstad, an English teacher and choir director at Katella High School, in the school parking lot after an evening rehearsal. He blocked her from getting to her car

and, after verifying her identity, said, "I know what you're doing and I don't like it and I'm here to let you know." His eyes were angry and his tone was harsh and frightening. Selstad stepped backwards and took off running. When he chased her, she screamed for help. At trial, defendant said that his girlfriend had told him Selstad was making passes at her. He denied threatening Selstad or chasing her.

On November 30, 1989, defendant led a group of West Side Anaheim gang members toward a group of El Monte gang members near Anaheim High School. Defendant started a fistfight with Leonard Velasquez, a rival gang member. At trial, defendant claimed that he and his opponent threw punches at the same time.

On May 25, 1990, defendant assaulted Calvin Marshall. Marshall was leaving the house with his family and discovered defendant marking the sidewalk with gang symbols. When Marshall asked him to stop, defendant replied, "Nigger, this is my block. I will do what I want to do." When Marshall asked his wife to call the police, defendant hit him in the face very hard. Marshall grabbed onto of defendant and held him until the police arrived. A couple of days later, Marshall's wife awoke to find defendant and several other people vandalizing the family's van with a cement block and carving gang symbols on the side. The purpose of the vandalism, according to a gang expert, was to intimidate the Marshall family. Defendant was subsequently convicted of assault and battery. At trial, defendant and Renae Alvarez, whose boyfriend was also a member of West Side Anaheim, claimed that Marshall and his wife were the aggressors. Defendant denied participating in the vandalism of the van.

Defendant admitted to police that he was a member of the West Side Anaheim gang. He had a "WSA" tattoo on his shoulder and the word "Puro" on his upper arm, which had almost a "racist" connotation. The tattoo, combined with defendant's statement to Gonzalo Chavez at the Circle K, suggested that defendant did not like people whose ethnic background differed from his own.

On October 28, 1990, defendant assaulted David Hall, who had discovered defendant and a companion burglarizing his car. Hall chased and captured defendant, who warned that Hall would regret holding him. At trial, defendant claimed it was only brief mutual combat.

The prosecution also presented evidence of defendant's misconduct while incarcerated.

Shortly after midnight on January 1, 1992, Deputy Bradford Blakely responded to a disturbance on one of the housing floors of the Orange County

Central Jail. Many of the inmates (including defendant) had T-shirts over their heads and were yelling, rattling cell bars, and throwing burning objects out of their cells. When Blakely ordered them to return to their bunks, most complied. Defendant, however, refused and said, "Fuck you copper. Come an[d] get me." He then added newspapers and sheets to the fire and "mooned" and exposed himself to the deputies before retreating into his cell. Defendant disobeyed orders to come out and instead charged headfirst into the deputies. It took four deputies to wrestle him to the ground and cuff him. At trial, Jose Guillen and Alex Perez, fellow inmates and convicted felons, disputed Blakely's account. Defendant, too, claimed that he was just protecting himself.

On May 3, 1993, the module deputy in the administrative segregation unit of the jail informed Deputy Shawn Crisp that three of the inmates said they did not receive their lunch trays. Although two of the inmates had no tray in their cells, defendant had a tray in his hands. Crisp ordered two more meals to give to the other inmates, but not one for defendant. Defendant shook the cell door and screamed that he was going to "shank" Crisp the next chance he got. At trial, Robert Laimbeer, a fellow inmate with numerous felony convictions, claimed that he had received two trays that day and ate most of each before giving one of them, "out of respect," to defendant. He did not hear defendant utter any threats.

### D. Mitigating Evidence

The defense offered testimony from defendant and others concerning his turbulent childhood.

Defendant was born in Guatemala in 1971. His parents fought frequently and his father often came home drunk. When defendant was four and one-half years old, his mother abruptly left his father and placed defendant and his brother with a nanny. Defendant claimed the nanny left him outside on a pillar overnight or for longer periods if he wet his pants and that dogs sometimes attacked him. He saw his father only once during this period. When defendant was five years old, he was taken to live with his mother and stepfather in the United States.

Defendant was moved from one school to another in Anaheim, and his academic performance was unimpressive. He said his stepfather hit him with a belt if he made mistakes on his multiplication tables, although his brother questioned that account. He often received detentions in junior high school but would be beaten if he arrived home late. Defendant was transferred from one junior high school because of a fight and dropped out of school when he was 16 years old. He drank hard liquor, smoked marijuana, and experimented

with cocaine until his girlfriend convinced him to stop and enroll in a religious treatment program called "Set Free." When he returned home, however, his mother and stepfather pressured him to get a job and gave him an ultimatum of either joining the Job Corps or moving out of the house. Defendant moved out and lived on the streets for a week, until his mother sent him to Guatemala to learn about poverty.

Defendant, who was 16, arrived in Guatemala with only $20 in his pocket. He lived with his father and worked in a sweater factory, but was let go because business was poor. He next tried welding, but he injured his eyes the first week. He did not get along with his father's new wife, who eventually threw him out of the house. Forced back on the streets, defendant resumed using drugs and alcohol. He also resorted to theft. However, he also be-friended a number of children in the area and raised money for their sports programs.

Defendant stopped stealing because of fear of the Guatemalan death squads. After he had lost a lot of weight, he took the advice of Lillian Lopez, a neighbor, and enrolled in a rehabilitation program in Guatemala. Over the next five weeks, he committed himself to the program and exhibited a desire to help and share with others. Jacobo Castillo Colon, the program director, believed that defendant was in need of love and attention. Defendant was only in the first stage of the program when he returned to the United States. Castillo recommended that defendant remain in the program, but defendant's mother had already purchased tickets for defendant to return to the United States.

Defendant returned to Anaheim in July or August 1989. His stepfather continued to dislike him and occasionally beat him. It bothered defendant that his family kept pressing him to get a job. He went to live with Margarita Fernandez Garcia's family for a couple of years. Fernandez testified that defendant had only one change of clothing when he arrived and that he was a very fine, respectful boy. Defendant left when he was arrested for stealing a truck.

Defendant continued to drink and occasionally used drugs. His work history was spotty, and he spent some time in jail. He said it was difficult to find a job. Instead, he sometimes sold drugs.

In November 1991, defendant moved in with Jean Brock and her son, William Galloway. Galloway did "claim" the West Side Anaheim gang in a police interview but denied membership in it. Brock described defendant as polite, helpful, and respectful. She also said that she and defendant drank a lot. Galloway described defendant as "mild."

Brock and Galloway testified that defendant started drinking early in the day on November 20, 1991. Galloway and defendant had obtained a gun to protect Brock from a man who had attacked her earlier. Defendant was drunk, but he loaded the gun before he left the apartment that night.[2] Later that night, while they were driving around looking for drugs, defendant laughed about the Circle K murder. The next morning, defendant gave Brock $60 for rent and chuckled. A short time later, Galloway and some other friends accompanied defendant to Long Beach, where they spent the money defendant had taken from the robberies. Defendant said he could not believe he had shot two people. He said he shot the Circle K clerk because the clerk did not seem to believe he was serious. He said he hit the second clerk because the clerk was being an "ass." On the way back home, defendant decided he was going to turn himself in.

Gayle McGarrity, a sociocultural anthropologist, and Norman Morain, a sentencing consultant, each opined that defendant would do well in a structured, secure environment where he was respected and treated fairly. McGarrity testified that gang membership had provided defendant with the structure that he failed to receive at home and that defendant appeared to be a cultural nationalist.

Peter Chambers, a clinical and forensic psychologist, testified that defendant had experienced abandonment by his mother and father, which had resulted in poor choices in peer groups (such as gang membership) and a deviant lifestyle. He opined that defendant suffered from major depression, a sequel of posttraumatic stress disorder, and antisocial personality disorder.

## II. Guilt Phase Issues

### A. *Pretrial Issues*

#### 1. *Motion to Suppress Evidence Seized from Jean Brock's Apartment*

Before trial, defendant sought to suppress all evidence seized from the warrantless search of Jean Brock's apartment. Following a hearing, the trial court denied the motion in its entirety. Defendant now seeks review of that ruling insofar as it applies to the evidence found in the bedroom he shared with Brock's 16-year-old son, William Galloway. We find no error.

About half an hour after defendant's arrest, Detective Larry Garrison asked defendant for permission to search the apartment. Defendant replied that he

---

[2] Lawrence Plon, a pharmacologist specializing in psychology, opined that defendant's blood-alcohol level that night must have been 0.30. Although frequent drinkers can tolerate that level well, it could have been enough to cause a memory blackout, as the defense had claimed.

did not feel he could consent to a search since it was Brock's apartment. When Garrison informed defendant that Brock had already consented to a search, defendant appeared skeptical, so the police allowed Brock to come to the patrol vehicle and personally inform defendant that she had consented to the search. Defendant then agreed to the search and signed a consent form.[3]

■ Our review of the trial court's implied finding that defendant voluntarily consented to the search is limited. "The . . . voluntariness of the consent is to be determined in the first instance by the trier of fact; and in that stage of the process, 'The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence.' " (*People v. James* (1977) 19 Cal.3d 99, 107 [137 Cal.Rptr. 447, 561 P.2d 1135] (*James*).)

■ Defendant contends the trial court's ruling is fatally undermined by the fact that he was arrested and in handcuffs at the time his consent was sought, that he had not received any *Miranda* warnings (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]), and that he had not been informed of his right to withhold consent to the search. He is mistaken. As we have previously explained, the fact that a defendant is under arrest and in handcuffs at the time of giving consent " 'is but one of the factors, but not the only one, to be considered by the trial judge who sees and hears the witnesses and is best able to pass upon the matter' " (*James, supra,* 19 Cal.3d at p. 110), even if no *Miranda* warnings have been given. (*People v. Ratliff* (1986) 41 Cal.3d 675, 686–687 [224 Cal.Rptr. 705, 715 P.2d 665].) The same is true when the police fail to advise the defendant of his or her right to withhold consent. (*United States v. Drayton* (2002) 536 U.S. 194, 206–207 [153 L.Ed.2d 242, 122 S.Ct. 2105].)

That the police asked Brock for her consent to search the apartment and informed defendant of that fact in no way constituted a "false inducement[]" for defendant's consent or rendered his consent involuntary as a matter of law. After all, it was *defendant* who conditioned his willingness to consent on Brock's agreement. In any event, the police were entitled to communicate this relevant and truthful information to defendant as he made his decision. (Cf. *People v. Ratliff, supra,* 41 Cal.3d at p. 687.)

Inasmuch as Garrison made no overt or implied threat of force, his request for permission to search the apartment itself carried the implication that it

---

[3] After the search was completed, the police discovered that defendant was on probation with a search condition.

could be refused, and defendant was hardly a newcomer to the criminal justice system, we find ample support for the trial court's finding that defendant's consent was voluntary. (*United States v. Watson* (1976) 423 U.S. 411, 424–425 [46 L.Ed.2d 598, 96 S.Ct. 820].)

### 2. *Judicial Misconduct During Voir Dire*

Defendant complains next that the trial court's comments during death-qualification voir dire had the effect of encouraging the jury to return a death verdict in violation of his state and federal rights to due process, a fair trial, an unbiased jury, and a reliable guilt and penalty phase determination. The claim is without merit.

We observe first that defendant failed to object to any of the comments he now asserts as reversible error and thus has forfeited the claim. (*People v. Riel* (2000) 22 Cal.4th 1153, 1177 [96 Cal.Rptr.2d 1, 998 P.2d 969].) Defendant has not shown that a timely objection or an appropriate admonition could not have cured the harm. (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1106 [259 Cal.Rptr. 630, 774 P.2d 659]; cf. *People v. Hill* (1998) 17 Cal.4th 800, 820–822 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Even if the claim had been preserved, the record does not support defendant's claim of error. None of the comments identified by defendant can reasonably be characterized as "a recruiting drive for jurors who would return a death verdict."

(a) After one prospective juror stated he was in favor of the death penalty "as long as somebody else does it," the prosecutor explained that there are "cases such as this being made out all across the county every day . . . where we're asking people from the community who don't know the attorneys, don't know any of the witnesses, to come in and vote their moral conscience." The prosecutor then turned to a different prospective juror and asked whether the juror could offer the benefit of his honesty, intelligence, common sense, and experience in coming to a fair and just verdict in this case. When the juror said he could, the court commented that there were at least two capital cases currently in the courthouse. The court's comment in no way diminished the gravity of the jury's task. To the contrary, the court informed the venire that "[t]his is an important case to both sides, and it's an important case to society. It's an important case to you if you serve on the case. It's an important case to you even if you don't serve on the case."

(b) When a prospective juror stated that he supported the death penalty because he believed it was a deterrent, the court agreed that it was a deterrent to the person executed but warned that the notion of general deterrence was a controversial one and, more importantly, that the juror's task was not to "send any message to any future criminal that may be out in the community to stop

them from committing crimes by your conduct of a particular capital case. [¶] So the moral is, you should *not* impose a death sentence for the reason solely of deterrent but *only if it's the appropriate punishment as to the particular individual who is being sentenced.* Okay?" This was not error. (Cf. *People v. Bittaker, supra,* 48 Cal.3d at pp. 1105–1106.)

(c) In discussing the evidence that might be presented at a potential penalty phase, the court explained to a prospective juror that "aggravating factors may be other bad things, bad conduct, possible criminal conduct of the defendant, that *naturally* points you towards the death penalty. You are also entitled to consider as an aggravating factor the crime that you just had found the defendant guilty of. [¶] The mitigating factors will be offered by the defense, generally speaking, and they are substantially unlimited. [¶] Can you assure us that you will be open to be persuaded by both sides as they offer mitigating and aggravating circumstances during the penalty phase of the trial?" Several days later, the court advised a different prospective juror that the charged murders "are factors potentially of aggravation that you can use that *naturally* point to the death penalty. But you will not lock yourself in, no matter how bad the crimes, until you have heard all the evidence to the death penalty. [¶] In other words, you would be open, right? [¶] . . . [¶] If during the course of the trial . . . you hear something about the defendant that [is] sympathetic, then you can use [it] in the penalty phase." In neither instance did the trial court instruct the panel that particular evidence "naturally" led to the imposition of the death penalty. Rather, the court merely defined "aggravating circumstances" as those that weigh in favor of death and "mitigating circumstances" as those that weigh in favor of a life sentence.

(d) Early in the process, the court exhorted the panel that "[f]or those of you that actually serve on the case, many of you may believe that it's the most important thing that you do in your whole life. So that's the commercial for you to consider strongly, forgetting about the lame excuses you were thinking about giving me, to honor your oath as a juror and do the job that society requires as appropriately honest and decent citizens." Several days later, after discussing with a prospective juror the need for a panel that has the inner strength to fairly consider either sentencing option according to the evidence, the court referred back to its earlier statement that "these kinds of cases often times are the most rewarding thing, in a sense of doing something for society that many of the jurors will ever experience in their whole [lives]. So I would urge you to stay on the case, all of you, if you can, if you meet all the qualifications and have the appropriate tenacity. [¶] So how do you feel about it? Are you interested in staying or do you want out of here?" This record flatly rebuts defendant's claim that the court's comments indicated that only a death verdict would demonstrate "tenacity" and would be "rewarding" to those who served.

(e) In examining a prospective juror who was a witness in a different trial (and was ultimately excused from the venire), the court elicited that the juror believed in the death penalty and believed that somebody who valued life would not take somebody else's life. The juror also stated that she would not be "the type of person you guys are looking for." When defense counsel then interrupted to announce that he and the prosecutor had stipulated to the dismissal of this prospective juror because of her testimonial obligations in the other courtroom, the court joked to the prosecutor, "Okay. She's saying a lot of good things here, though." Defense counsel replied that he had "mentioned" that to the prosecutor, who groused that the prospective juror had said those things "after I was willing to stipulate, so I'm stuck with it." Defendant's contention that the court, through this exchange, made it "unmistakably clear" to the venire that a death verdict was warranted in this case is fanciful, and we reject it.

In sum, none of these statements communicated a "strong judicial partisanship on the material matter of the penalty."

### 3. *Judicial Decorum*

Defendant complains that the court's comments, quips, and banter during voir dire and the penalty phase injected "prejudicial levity into a very serious proceeding." He contends the jury was "overly entertained," thereby diminishing the jurors' responsibility to reach a death verdict "in a reliable fashion" in violation of his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution. Although the liberal use of humor in a capital case is a delicate matter that has the potential to raise concerns about proper judicial decorum, the comments here do not cast doubt on the validity of defendant's conviction.

As defendant concedes, he failed to object to any of the "over 40 quips and humorous comments" he now challenges on appeal. He has thereby forfeited his objections. (*People v. Riel, supra*, 22 Cal.4th at p. 1177; *People v. Freeman* (1994) 8 Cal.4th 450, 511 [34 Cal.Rptr.2d 558, 882 P.2d 249].) We also reject his claims on the merits.

■ "Although a jury trial, especially for a capital offense, is obviously a serious matter, 'Well-conceived judicial humor can be a welcome relief during a long, tense trial. Obviously, however, the court should refrain from joking remarks which the jury might interpret as denigrating a particular party or his attorney.' " (*People v. Freeman, supra*, 8 Cal.4th at p. 511; see also *People v. Riel, supra*, 22 Cal.4th at p. 1175.) Defendant does not claim here that the court denigrated defendant or his attorney or otherwise called into question the court's impartiality. (*People v. Melton* (1988) 44 Cal.3d 713,

753 [244 Cal.Rptr. 867, 750 P.2d 741] (*Melton*); cf. *Ng v. Superior Court* (1997) 52 Cal.App.4th 1010, 1024 [61 Cal.Rptr.2d 49].) Indeed, defendant concedes that judicial comment exhibiting bias against the defense "is not the issue" here. He argues instead that the court's reliance on humor improperly diminished the jury's sense of responsibility for its death verdict. The record does not support his claim.

The trial judge explained during voir dire that he had known the attorneys "for a long, long time," believed that both counsel were "competent, intelligent and decent human beings," and therefore "in all probability . . . will have friendly exchanges with both" and "may be flippant occasionally." Defendant relies in particular on two occasions when the court quipped that recalcitrant prospective jurors should be shot and one occasion when the court similarly joked that jurors who were caught talking about the case in violation of the admonition would be shot. We have reviewed the entire record, including each example defendant cites in support of his claim. These comments, even when considered in conjunction with the trial judge's numerous other efforts at humor throughout the trial, did not so trivialize the proceedings as to raise a question whether the jurors were fully conscious of the gravity of their decision. (*People v. Hess* (1970) 10 Cal.App.3d 1071, 1081 [90 Cal.Rptr. 268]; accord, *State v. Simmons* (Mo. 1997) 955 S.W.2d 752, 774 [court's humorous but disparaging comments about sequestration " 'were nothing more than reasonable attempts by the Court to use humor to alleviate the tedium of voir dire and did not, as a matter of fact, have the direct or indirect effect of forcing the sitting juries to hasten deliberations or otherwise act unfairly' "].)[4] CALJIC No. 17.30, which instructed the jury not to take its cue from the judge, further bolsters our analysis. (*People v. Chong* (1999) 76 Cal.App.4th 232, 244–245 [90 Cal.Rptr.2d 198].) Defendant cites no authority to justify a contrary conclusion.

Although we have concluded that defendant's rights were not infringed by the trial judge's comments, we reiterate that even well-conceived judicial humor is best invoked in measured doses.

### B. *Admissibility of Ashokkumar Patel's Dying Declaration*

Ashokkumar Patel, the clerk at Hanshaw's Liquor Store, was shot in the back, below his shoulder blade. When the police arrived at the liquor store, Patel told them that he had been robbed and shot and that the shooter was a short Mexican male who had arrived in a car. Those statements were admitted at trial as a dying declaration over defendant's hearsay objection. Defendant

---

[4] Our conclusion is unaffected by the alleged intermittent failure of the record to reflect the existence of laughter and the failure of the record to provide a record of who was laughing.

renews his hearsay objection here and, in a supplemental brief, argues for the first time that the admission of Patel's statement also violated his federal constitutional rights under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*). The claim is without merit.

■ As to the hearsay objection, the prosecution established the objective severity of Patel's fatal wounds as well as his subjective awareness of those wounds. A dying declaration constitutes an exception to the hearsay rule if the statement was made on personal knowledge, which is not disputed here, and "under a sense of immediately impending death." (Evid. Code, § 1242.) " 'This sense of impending death may be shown in any satisfactory mode, by the express language of the declarant, or be inspired from his evident danger, or the opinions of medical or other attendants stated to him, or from his conduct, or other circumstances in the case, all of which are resorted to in order to ascertain the state of the declarant's mind.' " (*People v. Tahl* (1967) 65 Cal.2d 719, 725 [56 Cal.Rptr. 318, 423 P.2d 246].) In this case, the prosecutor relied on the declarant's statements, demeanor, and conduct, as well as his evident injuries. The gunshot pierced Patel's respiratory system, his gastrointestinal system, and his liver. The chest wound and the liver damage were each "of a great magnitude and dangerous in itself." These wounds were the cause of death, which occurred 11 days later. Further, Officer Cheryl Murphy testified that at the time the statements were made, Patel knew he had been shot, was in great pain and on the ground in a fetal position, was fearful of dying, and never spoke again. Accordingly, the trial court did not abuse its discretion in admitting the statements under the exception for dying declarations, even though Patel lingered on for several more days before dying. (*Tahl, supra*, 65 Cal.2d at pp. 725–727.)

■ As to the constitutional objection (and assuming without deciding that defendant did not forfeit this claim by failing to object on this basis below), we conclude that the admission of Patel's dying declaration did not violate the Sixth Amendment's confrontation clause. Defendant relies exclusively on *Crawford*, which repudiated the high court's prior ruling in *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531], under which an unavailable witness's statements were admissible against a criminal defendant if the statement bore "adequate 'indicia of reliability.' " (*Id.* at p. 66.) To meet that latter test, evidence had to fall within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness." (*Ibid.*) In overruling *Roberts, Crawford* held that out-of-court statements by a witness that are testimonial are barred under the Sixth Amendment's confrontation clause unless the witness is shown to be unavailable and the defendant has had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the trial court. "Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to

amorphous notions of 'reliability.'. . . . To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." (*Crawford, supra*, 541 U.S. at p. 61 [124 S.Ct. at p. 1370].)

Defendant asserts that *Crawford* has abrogated the exception for dying declarations. Yet the holding of *Crawford* does no such thing, inasmuch as the challenged out-of-court statements there were admitted by the state court under a finding that the statements bore " 'particularized guarantees of trustworthiness.' " (*Crawford, supra*, 541 U.S. at p. 40 [124 S.Ct. at p. 1358].) The analysis in *Crawford*, which relies heavily on the right of confrontation as it existed "at common law, admitting only those exceptions established at the time of the founding" (*id.* 541 U.S. at p. 54 [124 S.Ct at p. 1365]), also fails to support defendant's position. Although the high court found "scant evidence that exceptions were invoked to admit *testimonial* statements against the accused in a *criminal* case" at common law (*id.* at p. 1367), "[t]he one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. [Citations.] Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. [Citations.] We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis*." (*Id.* at p. 1367, fn. 6.) Confronted now with that precise issue, we conclude that the dying declaration in this case passes constitutional muster.

██ Dying declarations were admissible at common law in felony cases, even when the defendant was not present at the time the statement was taken. (Peake, Evidence (3d ed. 1808) p. 64.) In particular, the common law allowed " 'the declaration of the deceased, after the mortal blow, as to the fact itself, and the party by whom it was committed,' " provided that " 'the deceased at the time of making such declarations was conscious of his danger.' " (*King v. Reason* (K.B. 1722) 16 How. St. Tr. 1, 24–25.) To exclude such evidence as violative of the right to confrontation "would not only be contrary to all the precedents in England and here, acquiesced in long since the adoption of these constitutional provisions, but it would be abhorrent to that sense of justice and regard for individual security and public safety which its exclusion in some cases would inevitably set at naught. But dying declarations, made under certain circumstances, were admissible at common law, and that common law was not repudiated by our constitution in the clause referred to, but adopted and cherished." (*State v. Houser* (Mo. 1858) 26 Mo. 431, 438; accord, *Mattox v. United States* (1895) 156 U.S. 237, 243–244 [39 L.Ed. 409, 15 S.Ct. 337] ["from time immemorial they have been treated as competent

testimony, and no one would have the hardihood at this day to question their admissibility"].) Thus, if, as *Crawford* teaches, the confrontation clause "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding" (*Crawford, supra,* 124 S.Ct. at p. 1365, citing *Houser, supra,* 26 Mo. at pp. 433–435), it follows that the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment. We therefore conclude the admission of Patel's dying declaration was not error.[5]

### C. *Alleged Instructional Errors*

Defendant challenges a number of instructions, claiming that they violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and (except as to the manslaughter instruction) the analogous provisions of the California Constitution.

### 1. *Manslaughter Instruction*

The information charged murder in counts 3 and 10. As defendant points out, however, a portion of the instructions concerning lesser included offenses mistakenly referred to different counts: "If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime charged, you may nevertheless convict him of any lesser crime, if you are convinced beyond a reasonable doubt that the defendant is guilty of such lesser crime. [¶] The crime of voluntary manslaughter is lesser to that charged in counts *1* and *5.*" In reality, count 1 charged commercial burglary, and count 5 charged false imprisonment. Fearing that the jury was thereby prevented from returning a verdict of manslaughter as a lesser offense to murder, defendant asserts his murder convictions must be reversed. When, however, the jury instructions are considered as a whole, it is not reasonably likely the jury misunderstood the role of the manslaughter instruction. (*People v. Kelly* (1992) 1 Cal.4th 495, 525–527 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

Although that lone instruction misnumbered the charged counts, the other instructions stated explicitly that the crime of voluntary manslaughter "is a lesser included offense of the crime of murder"; that if a reasonable doubt existed as to whether the crime was murder or manslaughter, the jury "must give the defendant the benefit of such doubt and find it to be manslaughter rather than murder"; and that the distinction between murder (other than felony murder) and manslaughter is that murder (other than felony murder) requires malice. In addition, the verdict forms reiterated that manslaughter

---

[5] We do not decide whether Patel's statement was testimonial within the meaning of *Crawford,* nor whether the statement was admissible on other grounds. (See *Crawford, supra,* 124 S.Ct. at p. 1370.)

was a lesser included offense of murder *as charged in counts 3 and 10.* Finally, the prosecutor's argument correctly and repeatedly explained that manslaughter was a lesser included offense of murder. Under these circumstances, it is not reasonably likely the jury failed to consider manslaughter as a lesser included offense to murder.

### 2. *CALJIC No. 2.90*

Defendant contends the standard reasonable doubt instruction used at his trial—former CALJIC No. 2.90—unconstitutionally permitted the jurors to take into account moral considerations in determining his guilt. As he acknowledges, however, the United States Supreme Court has sustained the language of former CALJIC No. 2.90 against constitutional challenge (*Victor v. Nebraska* (1994) 511 U.S. 1, 6 [127 L.Ed.2d 583, 114 S.Ct. 1239], affg. *People v. Sandoval* (1992) 4 Cal.4th 155, 185–186 [14 Cal.Rptr.2d 342, 841 P.2d 862]), and this court consistently has affirmed the validity of the instruction. (*People v. Heard* (2003) 31 Cal.4th 946, 979 [4 Cal.Rptr.3d 131, 75 P.3d 53]; *People v. Lewis* (2001) 25 Cal.4th 610, 651–652 [106 Cal.Rptr.2d 629, 22 P.3d 392].) Defendant has not submitted any argument that would undermine these decisions.

### 3. *CALJIC No. 8.81.17*

Defendant argues that the jury instructions removed "an essential element" of the burglary-murder and robbery-murder special-circumstance allegations—i.e., that the murder was committed to facilitate the specified felony. We conclude that defendant did not suffer any prejudice.

The challenged instructions, which were based largely on CALJIC No. 8.81.17, were virtually identical to each other and stated in relevant part: "To find that the special circumstance . . . is true it must be proved: [¶] One, that the murder was committed while the defendant was engaged in the commission or attempted commission of [the specified felony], *or* [¶] Two, the murder was committed in order to carry out or advance the commission of [the specified felony] or to facilitate the escape therefrom or to avoid detection. [¶] In other words, the special circumstance referred to in these instructions is not established if the [specified felony] was merely incidental to the commission of the murder." Defendant contends that the instruction's use of the disjunctive "or" (italicized above), rather than the conjunctive "and," erroneously permitted the jury to find the allegations true without first finding the essential element that the murder was committed to facilitate the burglary or robbery.

The second paragraph of CALJIC No. 8.81.17 derives from *People v. Green* (1980) 27 Cal.3d 1, 59–62 [164 Cal.Rptr. 1, 609 P.2d 468], in which

we determined that the felony-murder special circumstance did not apply where the defendant's intent was not to steal but to kill and the robbery is merely incidental to the murder because its sole object is to facilitate or conceal the primary crime. We subsequently held, however, that inasmuch as *Green* did not announce a new element of the special circumstance allegation but had merely clarified the scope of an existing element, a trial court had no sua sponte duty to provide a clarifying instruction in the absence of evidence to support a finding that the felony was in fact merely incidental to the murder. (*People v. Kimble* (1988) 44 Cal.3d 480, 501–503 [244 Cal.Rptr. 148, 749 P.2d 803].) Thus, unless the evidence supports an inference that the defendant might have intended to murder the victim without having an independent intent to commit the specified felony, there is no duty to include CALJIC No. 8.81.17's second paragraph. (*People v. Navarette* (2003) 30 Cal.4th 458, 505 [133 Cal.Rptr.2d 89, 66 P.3d 1182]; *People v. Harden* (2003) 110 Cal.App.4th 848, 860–866 [2 Cal.Rptr.3d 105].)

Here, there was no substantial evidence to reasonably suggest defendant entered the store or committed a robbery merely in order to murder either victim. As to the first murder, uncontradicted evidence revealed that defendant shot Singh when Singh failed to comply with defendant's orders not to move and that defendant relied on the murder to show the other robbery victims that he was not kidding around. Although (as defendant points out) Singh may also have been selected because of his race, concurrent intents to kill and to commit a felony nonetheless support a felony-murder special circumstance. (*People v. Prieto* (2003) 30 Cal.4th 226, 257 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; *People v. Harden, supra,* 110 Cal.App.4th at pp. 866–867.) As to the second murder, defendant eliminated the only witness to the burglary-robbery. (*People v. Gurule* (2002) 28 Cal.4th 557, 628 [123 Cal.Rptr.2d 345, 51 P.3d 224].) Thus, the evidence showed only that defendant committed these murders to advance the burglary-robbery or to facilitate his escape or to avoid detection. Inasmuch as the second paragraph properly could have been omitted from the instructions, defendant suffered no prejudice by the trial court's error in phrasing the two paragraphs in the disjunctive.

### 4. *Multiple Felony-murder Special Circumstances*

■ Defendant also asserts that section 190.2, subdivision (a)(17) does not allow the prosecutor to charge, or the jury to find true, multiple felony-murder special circumstances as to each murder. We have repeatedly rejected this contention (e.g., *People v. Holt* (1997) 15 Cal.4th 619, 682 [63 Cal.Rptr.2d 782, 937 P.2d 213]), and do so again here. "Only a strained construction of the language of this section would support a conclusion that section 190.2(a)(17) permits only one special circumstance finding regardless

of the number of felonies in which a defendant was engaged at the time of a murder." (*People v. Holt, supra,* 15 Cal.4th at p. 682.)

### D. *Cumulative Error*

Defendant argues that even if no single error requires reversal of his convictions, the cumulative effect of the errors must be deemed sufficiently prejudicial to warrant this remedy. Defendant has demonstrated few errors, and we have found each possible error to be harmless when considered in isolation. Considering them together, we likewise conclude their cumulative effect does not warrant reversal of the judgment.

### III. PENALTY PHASE ISSUES

### A. *Alleged Griffin Error*

Defendant, who did not testify at the guilt trial, took the stand at the penalty trial. He testified only about the circumstances of his life prior to the murders. The prosecutor attempted, unsuccessfully, to cross-examine defendant about the details of the murders. Defendant contends that these questions violated his constitutional privilege against self-incrimination under *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] (*Griffin*) as well as the Fifth, Eighth, and Fourteenth Amendments and therefore require reversal of the judgment of death.

■ The Fifth Amendment to the United States Constitution prohibits any comment by the prosecution on a defendant's failure to testify at trial that invites or allows the jury to infer guilt therefrom. (*Griffin, supra,* 380 U.S. at pp. 611–615.) At the guilt phase of a trial, "[d]irecting a jury's attention to a defendant's failure to testify at trial runs the risk of inviting the jury to consider the defendant's silence as evidence of guilt." (*People v. Lewis, supra,* 25 Cal.4th at p. 670.) " 'Similarly, we have recognized that a prosecutor may not urge that a defendant's failure to take the stand at the penalty phase, in order to confess his guilt after having been found guilty, demonstrates a lack of remorse.' " (*People v. Boyette* (2002) 29 Cal.4th 381, 454 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

In this penalty phase, however, defendant *did* take the stand. At the close of direct examination, defense counsel explained to the court that he had elected not to inquire into the two murders and would interpose an objection of "beyond the scope" if the district attorney brought up the topic. After the court expressed skepticism that the defense could put on a "conditional examination," the district attorney stated this was a "very touchy" area and asked for time to conduct additional research before asking "too many

questions" about the murders. On cross-examination, the district attorney therefore inquired, "Would you like to talk with me about the crimes that you committed against Tarsem Singh and Ashokkumar Patel?" The trial court sustained an objection, commenting that "[h]e's not here to talk with you." When the district attorney rephrased the question, defense counsel objected on Fifth Amendment grounds and as beyond the scope of the direct examination. The court overruled the objection, stating that "[w]hen a defendant chooses to take the stand and testify in a criminal action he waives his right against self-incrimination. . . . If you want to ask him questions about the crime you may do so." In order to "protect the record," the district attorney instead continued to ask whether defendant would be "willing" to answer questions about the crimes. Defense counsel instructed his client not to answer, then withdrew the instruction when the court threatened contempt. After the court sustained relevance objections to two more questions as to defendant's willingness to testify voluntarily about the murders, the parties went to a sidebar conference.

At sidebar, the district attorney explained that he was proceeding in this fashion "[a]s a precautionary measure." The court offered a prediction that defendant would eventually testify voluntarily about the murders "[f]or the reason that the court will probably order that all of the testimony be stricken in the event he fails to fully comply with cross-examination." The district attorney promptly asked for an opportunity to research the issue "[b]efore the court does that. . . . [¶] I don't want the judge to force him to answer any questions until I know."

In open court, the court informed the jury that the last question had been withdrawn. The following Monday, the district attorney explained that since there were cases "both ways" on the validity of defendant's invocation of the privilege in these circumstances, he had decided not to ask defendant about the murders.

 Defendant argues that, notwithstanding the fact the defense objections were sustained and defendant never had the opportunity to answer, the district attorney's questions violated his privilege against self-incrimination. As the district attorney noted, the cases are divided as to a capital defendant's ability to testify at the penalty trial on some topics but not others. (Compare *Lesko v. Lehman* (3d Cir. 1991) 925 F.2d 1527, 1542 ["we do not believe that a defendant's penalty phase testimony about mitigating factors that are wholly collateral to the charges against him operates as a complete waiver of the defendant's self-incrimination privilege or his rights under *Griffin*"] and *State v. Cazes* (Tenn. 1994) 875 S.W.2d 253, 265–266 [following *Lesko*] with *Com. v. Clark* (1998) 551 Pa. 258 [710 A.2d 31, 40] ["we reject the rationale of *Lesko*"] and *Tucker v. Francis* (11th Cir. 1984) 723 F.2d 1504,

1515 [prosecutor may properly comment at penalty phase on defendant's failure to testify at the guilt phase; "since the waiver and the prosecutor's comment occurred after guilt had been determined, it caused no adverse affect on the culpability determination"].) Yet, even assuming that defendant was entitled to resist efforts to inquire into the circumstances of the crime at the penalty trial once he had taken the stand, we cannot discern any prejudice. The district attorney made no reference to the exchange in closing argument. Even at the time, the district attorney nowhere suggested that defendant's failure to answer these questions exhibited a lack of remorse. (See *People v. Boyette, supra,* 29 Cal.4th at p. 455.) Nor did the district attorney suggest that defendant's silence was evidence of his guilt of the murders—although, inasmuch as defendant had already been convicted of the crimes, any such inference could have had only a trivial effect on the subject. In sum, defendant offers nothing to question the applicability of the general rule that " ' "[i]ndirect, brief and mild references to a defendant's failure to testify, without any suggestion that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error." ' " (*Id.* at pp. 455–456; see also *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 66 [17 Cal.Rptr.3d 710, 96 P.3d 30]; *People v. Vargas* (1973) 9 Cal.3d 470, 478 [108 Cal.Rptr. 15, 509 P.2d 959].)[6]

### B. *Challenges to the Admissibility of Evidence*

Defendant challenges the admission of certain evidence as violative of his state and federal rights to due process, a fair trial, a fair and reliable penalty determination, and to be free from cruel and unusual punishment.

### 1. *Evidence of Vandalism as an Aggravating Factor*

Factor (b) of section 190.3 directs the trier of fact to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Factor (b) encompasses only those threats of violence that are directed against persons, not property. (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1016 [30 Cal.Rptr.2d 818, 874 P.2d 248]; *People v. Boyd* (1985) 38 Cal.3d 762, 776 [215 Cal.Rptr. 1, 700 P.2d 782].) Invoking *Kirkpatrick* and *Boyd,* defendant claims that the admission of evidence concerning the vandalism of the Marshalls' van on May 27, 1990, was outside the scope of factor (b) and, because it deprived him of a state-created liberty interest, also violated the federal Constitution. He is mistaken.

---

[6] Defendant's claim that the district attorney's questions exceeded the scope of the direct examination likewise fails for lack of prejudice. (*People v. Wharton* (1991) 53 Cal.3d 522, 595–596 [280 Cal.Rptr. 631, 809 P.2d 290].)

Claudia Jones-Marshall testified that in the early morning hours of May 27, 1990—a couple of days after defendant marked her sidewalk with graffiti, insulted and assaulted her husband, and was arrested—she was awakened by a noise. She looked out the window and saw people hitting her van with a cement block. Defendant was scratching "WSA," the initials of his gang, on the side of the van. As the prosecution's gang expert, Alfonso Valdez, explained, the vandalism was a warning to the Marshalls not to "mess" with the gang. The purpose of the act was to instill "fear." Thus, the act of vandalism unquestionably qualified as an express or implied threat to use force or violence against the Marshalls under section 190.3, factor (b).

Defendant then argues that even if the act could have been viewed as a threat against the Marshalls, the instructions permitted the jury to consider it as an aggravating factor even if it believed only that the vandalism was a crime against property. He relies on the jury instruction that defined a threat of force or violence under section 140: "Every person who willfully threatens to use force or violence upon the person of a witness to, or victim of, a crime or any other person, or to take, damage, or destroy any property of any witness, victim, or any other person, because the witness, victim, or informant has provided any assistance or information to a law enforcement officer or to a public prosecutor in a criminal proceeding or juvenile court proceeding, is guilty of the crime of threat of force or violence because of assistance in prosecution under Penal Code Section 140." Defendant reasons that, under this instruction, the jury could have believed he committed "the crime of threat of force or violence" if he merely acted "to take, damage, or destroy any property of any witness, victim, or any other person" without any finding that such conduct constituted a threat against a *person*.

Defendant, however, fails to consider the further limitation contained in CALJIC No. 8.87 which, as modified for this trial, instructed the jury that it may consider the "implied threat of force or violence against Calvin and Claudia Jones-Marshall . . . on May 27, 1990" only under specified conditions: "You may not consider crimes against property as an act of violence in and of itself, but may only consider such evidence if you determine it to be directly related to a threat of violence upon another. If you do not so find, a crime against property is not a crime of violence to be considered as an [aggravating] factor." In other words, even if the jury believed the act of vandalism did not constitute a threat against the Marshalls but was merely vandalism against property, they would have understood from the other instructions that a crime against property could not be considered as an aggravating factor. Hence, it is not reasonably likely the jury would have interpreted the instructions in the way defendant suggests. We therefore reject his state claim of error as well as the federal constitutional claim on which it depends.

## 2. Evidence of Defendant's Gang Affiliation

Defendant claims that the trial court erred in admitting evidence of his membership in the West Side Anaheim gang as well as evidence of the gang's activities and the motivations of gang members to participate in criminal activities. In his view, this evidence was irrelevant and unduly prejudicial. We disagree.

Defendant argues first that the trial court erred in permitting Officer Floyd Smith, who testified about defendant's involvement in the November 30, 1989, assault near Anaheim High School, to testify also that defendant was a "hardcore" gang member, that the assault was preceded by "mad dogging" (a slang term referring to the practice of staring down the other gang when the two are too far apart to communicate), and that aggressiveness and violence earn a gang member respect from other gang members. Inasmuch as both defendant and the victim of the assault admitted to Smith that they were members of rival gangs, defendant contends that the remainder of Smith's testimony was irrelevant. But the point of Smith's testimony was not merely to show, as defendant assumes, that defendant "had committed an act of violence in fighting with the other young man." The prosecution sought to demonstrate instead that defendant had *led* a group of West Side Anaheim gang members to a confrontation with a rival gang, that the confrontation was deliberately *planned*, and that defendant had been the *aggressor* in the assault on the rival gang. Evidence concerning defendant's role in the gang as well as the motivations and common practices of gang members tended to corroborate Smith's eyewitness account and aided the jury in understanding what might have otherwise seemed like a personal grievance or random attack. (*People v. Gurule, supra,* 28 Cal.4th at p. 654; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 588 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) Likewise, evidence concerning Smith's training and experiences with the West Side Anaheim gang aided the jury in understanding the bases for Smith's opinions. (See *People v. Coleman* (1985) 38 Cal.3d 69, 92 [211 Cal.Rptr. 102, 695 P.2d 189].) Defendant's claim that this evidence was unduly prejudicial under Evidence Code section 352 is fatally undermined by his failure to recognize its relevance.

Defendant challenges next the testimony of prosecution gang expert Alfonso Valdez concerning the vandalism of the Marshalls' van. As discussed in the preceding section, Valdez opined that the motivation for vandalizing the vehicle was to intimidate the Marshalls. To explain why defendant and the other gang members would leave identifying gang markings on the vandalized van, Valdez explained that defendant and the others were unconcerned about being identified because "gangs operate on fear" and use that fear to dissuade witnesses from testifying. Valdez also testified that gangs are

highly territorial, as evidenced by the "O.C." tattoo (referring to Orange County) on defendant's arm, and that gang members are fiercely loyal to the gang, as evidenced by another tattoo of a happy face and a sad face (signifying "have fun now cry later"). This evidence helped explain why defendant committed the assault on a member of a rival gang and vandalized the Marshalls' van and why defendant committed these crimes without fear of being identified. (*People v. Tuilaepa, supra*, 4 Cal.4th at p. 588; *People v. Sandoval, supra*, 4 Cal.4th at p. 175.)

Defendant contends that even if this evidence was relevant, it was cumulative and extremely prejudicial, given that the trial court believed the vandalism itself (without the assistance of any expert testimony) to be "so obviously an attempt . . . [to] intimidat[e] people." That the trial court believed the vandalism was clearly an implied threat against the Marshalls without the assistance of an expert, however, did not mean that it was equally evident to a lay jury. The trial court did not abuse its discretion in allowing expert testimony to explain the significance of the vandalism, especially since defendant's cross-examination of Claudia Jones-Marshall, by focusing on the absence of a verbal threat during the incident, put in issue whether a threat was intended.

Defendant also challenges Valdez's testimony concerning his "Puro" tattoo. Valdez testified that this tattoo was "almost racist." Based on defendant's comments to other Hispanic males at the Circle K, Valdez further concluded that defendant "basically does not like other ethnic people. People from other ethnic origins." This evidence was relevant to show a motivation for—and the circumstances of—the murder of Singh (and perhaps Patel) and thus was relevant under factor (a) of section 190.3. With little direct evidence as to why defendant singled out Singh to murder, he can hardly complain that the probative value of this evidence was substantially outweighed by its potential prejudicial effect.

Finally, we reject defendant's claim that admission of the gang evidence violated the First Amendment and various other constitutional provisions. Because he failed to object on this ground below, he has forfeited the claim. (*People v. Williams* (1997) 16 Cal.4th 153, 250 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Even if it had been preserved, the relevance of the challenged evidence defeats his constitutional objection. (*Dawson v. Delaware* (1992) 503 U.S. 159, 164 [117 L.Ed.2d 309, 112 S.Ct. 1093]; accord, *State v. Fanus* (2003) 336 Ore. 63 [79 P.3d 847, 863–864].)

### 3. *Facts Underlying Defendant's Prior Convictions for Battery, Vandalism, and Fighting in Public*

Defendant was convicted of fighting in public arising from the assault on a rival gang member near Anaheim High School in November 1989 and was convicted of battery and vandalism arising from the attack on Calvin Marshall and the damage to Marshalls' van in May 1990. The facts and circumstances underlying those convictions were offered as factors in aggravation at the penalty trial. (See pts. III.B.1., & III.B.2., *ante.*) He contends the court erred in admitting the facts and circumstances underlying those convictions to the extent those facts tended to show that his conduct was more egregious than is revealed by the bare fact of conviction. In his view, reliance on facts and circumstances beyond the conviction itself or those minimally necessary to establish a conviction of those crimes violated the provisions listed above as well as the federal constitutional prohibition against double jeopardy. As he concedes, however, we have repeatedly rejected this claim (e.g., *People v. Hart* (1999) 20 Cal.4th 546, 641–642 [85 Cal.Rptr.2d 132, 976 P.2d 683]; *People v. Osband* (1996) 13 Cal.4th 622, 710–711 [55 Cal.Rptr.2d 26, 919 P.2d 640]), and do so again here. The facts presented to the jury, in each instance, constituted merely the circumstances of the crime of which defendant was convicted. (*People v. Cain* (1995) 10 Cal.4th 1, 71 [40 Cal.Rptr.2d 481, 892 P.2d 1224]; *People v. Johnson* (1992) 3 Cal.4th 1183, 1241–1242 [14 Cal.Rptr.2d 702, 842 P.2d 1].)

### 4. *Evidence of Defendant's Misdemeanor Offenses*

 Section 190.3 renders inadmissible at the penalty trial criminal activity "which did not involve the use or attempted use of force or violence or which did not involve the express or implied threat to use force or violence." The trial court nonetheless allowed the prosecution to elicit from defendant on cross-examination particulars of his misdemeanor criminal history, some of it nonviolent. Although this was error, it was not prejudicial.

On direct examination, as part of an effort to detail his turbulent background, defendant admitted that he had spent his 20th birthday in jail for vandalism and a probation violation and added that he did not feel very good about himself. On cross-examination, the district attorney attempted to impeach defendant by demonstrating that defendant in fact had been in jail on his birthday for a "number" of probation violations. When defendant claimed not to remember the particular violations, the district attorney elicited from defendant the circumstances of the vandalism charge—that he became claustrophobic in a room at the police department and had thrown a chair—and reviewed a portion of defendant's criminal record: the theft of a Toyota 4Runner in 1990, for which he was placed on probation; the burglary of a

Dodge van, for which he was placed on probation; the battery and vandalism arising from the Marshall incident, for which he was placed on probation; the burglary of David Hall's vehicle in October 1990, for which he was placed on probation; and a petty theft at a Circle K in 1989, for which he was placed on probation and ordered to stay away from Circle K stores. When the district attorney alluded to "other cases" in which defendant had received probation, defendant replied that he was "unsure" but believed there was one additional case.

Because defense counsel objected only to the questions concerning the Circle K theft charge, defendant has forfeited his claim of error as to the remaining offenses. (*People v. Kaurish* (1990) 52 Cal.3d 648, 702 [276 Cal.Rptr. 788, 802 P.2d 278].) Even if he had preserved the issue, we can perceive no possibility of a different result if this evidence had been omitted. The jury had already heard the details of the assault and vandalism charges involving the Marshalls as well as the burglary of David Hall's vehicle. The fact that defendant had been convicted of those offenses and placed on probation could not have affected the verdict. Given the circumstances of the two murders and the other aggravating factors, one more charge of burglary and vandalism, together with a petty theft,[7] could not have figured significantly in the jury's decision. (*Kaurish, supra,* at p. 702; *People v. Jackson* (1996) 13 Cal.4th 1164, 1233–1234 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) Indeed, the jury was plainly instructed not to consider any criminal acts or activity beyond the seven acts properly enumerated in the instructions as aggravating factors and was also instructed in particular that a crime against property in itself "is not a crime of violence to be considered as an aggravating factor."

### 5. *Evidence of Defendant's Threat Against Deputy Crisp*

On May 30, 1993, while in custody at the Orange County jail, defendant complained that he was not provided a lunch tray. When his cell door was opened, however, he came out with a tray in his hands. Deputy Crisp, who supervised the distribution of lunch trays, refused to provide defendant with another tray. In response, defendant flew into an "[a]bsolute rage," shook the cell door, and screamed repeatedly that he was going to kill Deputy Crisp with a shank the next chance he got. Deputy Crisp took the threat very seriously.

Defendant claims that the foregoing did not establish a criminal offense. We disagree. Threatening to kill a sheriff's deputy for the performance of his

---

[7] In any event, to the extent the petty theft at the Circle K and the stay-away order could have supplied a motive for the robbery-murder there, it might have been admissible as a circumstance of the crime under section 190.3, factor (a).

duty would appear to violate section 71, which provides that "[e]very person who, with intent to cause, attempts to cause, or causes, . . . any public officer or employee to do, or refrain from doing, any act in the performance of his duties, by means of a threat, directly communicated to such person, to inflict an unlawful injury upon any person or property, and it reasonably appears to the recipient of the threat that such threat could be carried out, is guilty of a public offense . . . ." (See *People v. Boyd, supra,* 38 Cal.3d at p. 777.) This was not a random outburst uttered while officers patrolled outside (cf. *People v. Tuilaepa, supra,* 4 Cal.4th at p. 590); rather, defendant's threat was plainly uttered in response to the deputy's proper execution of his duties. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1153 [124 Cal.Rptr.2d 373, 52 P.3d 572] ["to the extent his official duties included overseeing the custody and control of defendant and his fellow inmates, a threat to kill a deputy constituted an attempt to deter or prevent Deputy Shafia from performing his official duties"].) Nor did Crisp believe the threat was an idle one (cf. *Tuilaepa, supra,* 4 Cal.4th at p. 590 ["the recipients of these threats indicated they did not actually fear for their safety"]), since inmates had been able to manufacture shanks and other weapons despite the jail's best efforts to prevent it and defendant's rage was unmistakable. (See *People v. Hines* (1997) 15 Cal.4th 997, 1060 [64 Cal.Rptr.2d 594, 938 P.2d 388].) Thus, this incident was properly admitted as an aggravating factor.

██ We also reject defendant's claim that his threats against Deputy Crisp were protected speech under the First Amendment. " 'As long as the threat reasonably appears to be a serious expression of intention to inflict bodily harm [citation] and its circumstances are such that there is a reasonable tendency to produce in the victim a fear that the threat will be carried out,' a statute proscribing such threats 'is not unconstitutional for lacking a requirement of immediacy or imminence.' " (*People v. Hines, supra,* 15 Cal.4th at p. 1061, quoting *In re M.S.* (1995) 10 Cal.4th 698, 714 [42 Cal.Rptr.2d 355, 896 P.2d 1365].)

### 6. *Evidence of Unadjudicated Offenses*

██ Defendant contends the trial court erred in allowing the prosecution to introduce evidence of two acts of violence—attacking Deputy Blakely and other deputies in January 1992 and threatening Deputy Crisp in May 1993—that had never been adjudicated. We have previously held, however, that section 190.3, factor (b), which authorizes the jury to consider unadjudicated criminal activity, does not violate either the state or federal Constitution. (*People v. Brown* (2003) 31 Cal.4th 518, 570–571 [3 Cal.Rptr.3d 145, 73 P.3d 1137]; *People v. Jones* (1998) 17 Cal.4th 279, 312 [70 Cal.Rptr.2d 793, 949 P.2d 890]; *People v. Johnson, supra,* 3 Cal.4th at p. 1244.) Defendant offers no basis to question our earlier rulings.

### 7. Evidence of Conduct Underlying Misdemeanor Charges That Were Subsequently Dismissed

Defendant also claims that the trial court erred in admitting evidence concerning the assault and battery against David Hall and the implied threat against the Marshalls arising from the vandalism of their van on the ground that each of those acts was the subject of misdemeanor charges that were subsequently dismissed under section 1385. He claims that the admission of these incidents violated section 190.3, which bars the admission of evidence at the penalty phase of prior criminal activity "for which the defendant was prosecuted and acquitted." We find no error.

We have strictly construed the limitation in section 190.3 concerning criminal activity for which the defendant was prosecuted and "acquitted" to refer only to "a determination of the merits." (*People v. Jennings* (1991) 53 Cal.3d 334, 390 [279 Cal.Rptr. 780, 807 P.2d 1009].) Thus, a charge that was dismissed under section 995, which is not a determination on the merits, is admissible at the penalty phase. (*People v. Ghent* (1987) 43 Cal.3d 739, 774 [239 Cal.Rptr. 82, 739 P.2d 1250].) Similarly, a charge that is dismissed under section 1385 remains admissible "unless the record clearly indicates that the trial court applied the substantial evidence standard." (*People v. Hatch* (2000) 22 Cal.4th 260, 273 [92 Cal.Rptr.2d 80, 991 P.2d 165].)

Defendant argues that the bar to refiling of a dismissed misdemeanor under section 1387, subdivision (a) "resulted in the functional equivalent of an acquittal." He is mistaken. An acquittal requires more than a bar to further proceedings; it requires " 'a disposition based upon a determination of the merits.' " (*People v. Hatch, supra*, 22 Cal.4th at p. 267, fn. 3, italics added.) Inasmuch as defendant does not contend that either disposition was based on the merits, neither incident was barred under section 190.3. (*People v. Heishman* (1988) 45 Cal.3d 147, 193 [246 Cal.Rptr. 673, 753 P.2d 629] ["a dismissal not based on any judicial determination with respect to the truth or falsity of the charge is not an acquittal under section 190.3"].) In any event, neither misdemeanor could have appreciably prejudiced the jury's consideration of the appropriate penalty.

Finally, we have previously rejected arguments that double jeopardy and speedy trial principles apply to the admission of evidence in aggravation presented at the penalty phase. (*People v. Hart, supra*, 20 Cal.4th at p. 641.)

### 8. Impeachment of Defense Witnesses with Prior Arrests

On cross-examination, the prosecution attempted to elicit the *arrest* records of three defense witnesses who testified at the penalty phase—Renae Alvarez,

who testified about the Marshall assault on May 25, 1990; Jose Guillen, who testified about the incident in the Orange County jail on January 1, 1992; and Robert Laimbeer, who testified about the incident involving Deputy Crisp on May 30, 1993. Although this was error, defendant was not prejudiced. Since the prosecution properly used prior felony convictions to impeach Guillen (one) and Laimbeer (at least five), the jury would not have needed to rely on mere arrests in evaluating the credibility of those witnesses. (*People v. Medina* (1995) 11 Cal.4th 694, 769 [47 Cal.Rptr.2d 165, 906 P.2d 2].) Although Alvarez did not have a felony conviction, her bias was amply established by evidence of her boyfriend's membership in defendant's gang, her conviction for vandalizing the Marshalls' van, and her obligation to pay restitution to the Marshalls.

We also note that the jury was instructed that "misdemeanor convictions, misdemeanor arrests or any reference thereto, should not be considered should they involve crimes against property, assaultive-type conduct, including but not limited to conduct such as discharging a firearm. These crimes do not reflect on a person's honesty and veracity and you are admonished to disregard any such evidence which has not previously been excluded or an objection sustained [thereto]. Again, you may only consider felony convictions or misdemeanor conduct which bears on a witness's veracity or truthfulness as I have previously indicated unless directed otherwise." As defendant points out, this instruction was internally inconsistent: on the one hand, it correctly told the jury to consider only felony convictions *or* misdemeanor conduct that bore on the witness's veracity or truthfulness, yet, on the other hand, it might have suggested (erroneously) that misdemeanor arrests for offenses that bore on a witness's veracity (and thus did not involve crimes against property or assaultive-type conduct) could also be considered. The prosecution established that Alvarez—but not Guillen or Laimbeer—had arrests of this type. Even assuming the instruction was error as to Alvarez, however, we nonetheless find it harmless, for the reasons stated above.

### C. *Exclusion of the BBC Video They Shoot Children, Don't They?*

Defendant contends next that the trial court violated his state and federal rights to due process, to present a defense, and to a reliable penalty determination by excluding a videotape of a BBC program, *They Shoot Children, Don't They?*, that he wished to present during the penalty phase. According to the defense offer of proof, the film detailed the life of a street child in Guatemala City, Guatemala, where defendant lived in the late 1980's, and the role of the local police in extorting, prostituting, torturing, and even murdering these children.

The video was first discussed by the parties at a hearing while the guilt phase jury was deliberating. The court had already viewed the program.

Defense counsel "suggest[ed]" to the court that the BBC program accurately depicted the life of street children in Guatemala City but offered no witness to authenticate the film or to opine on its fidelity to the life of street children in Guatemela City, nor did the defense offer any evidence of the temporal relationship between the events depicted in the film and the period during which defendant was in Guatemala. The prosecution therefore objected on relevance grounds. The court took the matter under submission, commenting that there was "a strong possibility that the defendant will be able to play the tape for the jury as long as he . . . tells us that he was threatened, that he was beaten and that he was perhaps raped, and all the other things that happened to those kids. Then maybe much if not all of the material on the tape would be relevant and appropriate. We will see what he says. . . . [¶] We can't tell until we hear from the defendant how he was abused."

Two weeks later, after the jury had returned its guilt phase verdicts, both sides had presented their penalty phase evidence, both sides had rested, and the jury had been told they would hear arguments of counsel that day, defense counsel asked for a ruling on the BBC program. The court replied, "[I]t's not before the court after evidence is concluded; however, the court does indicate a tentative ruling that it's not relevant and not connected up by any defense evidence. If you had offered it timely, I would not have allowed it." The court then denied defendant's request to reopen.

■ The decision to grant or deny a motion to reopen, even to reopen the penalty phase of a capital prosecution, remains in the discretion of the trial court. (*People v. Green, supra,* 27 Cal.3d at p. 42.) In this case, the evidence the defense sought to offer at reopening was indisputably available *during* the trial. Indeed, defendant offered no excuse for failing to secure a ruling prior to the close of evidence. The trial court was entitled to rely on defendant's lack of diligence in denying the motion to reopen. (*Ibid.*; *People v. Hawkins* (1935) 3 Cal.2d 623, 624–625 [44 P.2d 559].)

■ Moreover, as the trial court noted, the BBC program was "not relevant and not connected up with any defense evidence." The defense offered no witnesses or other evidence to authenticate the video or to show that the events depicted therein were relevant to the time period during which defendant was in Guatemala. (Cf. *People v. Mayfield* (1996) 14 Cal.4th 668, 747 [60 Cal.Rptr.2d 1, 928 P.2d 485] ["A video recording is authenticated by testimony or other evidence 'that it accurately depicts what it purports to show' "].) The video itself was also hearsay, since it was offered for its truth. (*People v. Kaurish, supra,* 52 Cal.3d at p. 705; see also *Wilson v. Piper Aircraft Corp.* (1978) 282 Ore. 61 [577 P.2d 1322, 1329–1330] [documentary film on airplane crashes was inadmissible hearsay]; *Carson Harbor Village, Ltd. v. Unocal Corp.* (C.D.Cal. 2003) 287 F.Supp.2d 1118, 1144–1145, fn. 160.)

Even if these hurdles had been surmounted, defendant failed to demonstrate the relevance of the video to his own experience. Defendant never claimed any personal contact with the police "death squads," and his belief that three of his friends were victims of the police was only speculation. To the extent the video depicted the general level of poverty in Guatemala, it was cumulative of the testimony of defendant and other witnesses. (*People v. Mincey* (1992) 2 Cal.4th 408, 465 [6 Cal.Rptr.2d 822, 827 P.2d 388].) The trial court therefore did not err in excluding it. (*People v. Nye* (1969) 71 Cal.2d 356, 371–372 [78 Cal.Rptr. 467, 455 P.2d 395].) And since the video had no relevance to defendant's character, prior record, or the circumstances of his offense, it follows that no constitutional error occurred. (*Lockett v. Ohio* (1978) 438 U.S. 586, 604, fn. 12 [57 L.Ed.2d 973, 98 S.Ct. 2954] (plur. opn. of Burger, C. J.); *People v. Fauber* (1992) 2 Cal.4th 792, 856 [9 Cal.Rptr.2d 24, 831 P.2d 249]; *People v. Dyer* (1988) 45 Cal.3d 26, 71 [246 Cal.Rptr. 209, 753 P.2d 1].)

### D. *Judicial Comments on the Evidence*

Defendant challenges several comments on the evidence made by the trial court. He claims that the court's comments were improper, lightened the prosecution's burden of proof, and deprived him of due process, a reliable penalty determination, and an unbiased decision maker under the state and federal Constitutions.

■ Article VI, section 10 of the California Constitution provides, in pertinent part: "The court may make any comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause." We have interpreted this provision to require that such comment " 'be accurate, temperate, nonargumentative, and scrupulously fair. The trial court may not, in the guise of privileged comment, withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power.' " (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1218 [120 Cal.Rptr.2d 477, 47 P.3d 262]; accord, *Patton v. United States* (1930) 281 U.S. 276, 288 [74 L.Ed. 854, 50 S.Ct. 253].) Thus, a trial court has "broad latitude in fair commentary, so long as it does not effectively control the verdict." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 768 [230 Cal.Rptr. 667, 726 P.2d 113].) "We determine the propriety of judicial comment on a case-by-case basis." (*People v. Cash* (2002) 28 Cal.4th 703, 730 [122 Cal.Rptr.2d 545, 50 P.3d 332].)

The Attorney General asserts, at the outset, that defendant failed to preserve this issue for review by interposing a timely objection to the court's comments. We agree. (*People v. Boyette, supra,* 29 Cal.4th at p. 459; *People v. Cash, supra,* 28 Cal.4th at p. 730.) Defendant has shown neither that an objection would have been futile nor that a timely admonition would have failed to cure any harm. Even assuming the claims had been preserved, however, we find no prejudicial error.

One set of challenged comments involved the court's participation during the questioning of witnesses for purposes of clarification. For example, during the defense's cross-examination of Calvin Marshall about the circumstances leading up to defendant's hitting Marshall, defense counsel asked, "And how did you get involved in this fight?" Inasmuch as no evidence had yet been offered that Marshall did anything after being punched other than to hold defendant until the police arrived, the court reasonably interjected, "What fight?"·

Then, during the prosecution's cross-examination of Renae Alvarez about the subsequent vandalism of the Marshalls' van, the court engaged in questioning designed to clarify whether Alvarez's boyfriend was a member of defendant's gang:

"Q. Was your boyfriend a member of the West Side Anaheim gang?

"A. Oh I don't know. He lived there. It was—it was—I guess it was a gang—it is a gang. But he lived there. He couldn't help from being around these people, he lived there.

"Q. That's your boyfriend?

"THE COURT: I didn't understand the answer. [¶] Was he a gang member or was he not a gang member?

"THE WITNESS: Well, I guess he was. I guess he was. He grew up there.

"THE COURT: He was a gang member?

"THE WITNESS: He was a gang member I guess.

"THE COURT: Now we have it straight. [¶] Go ahead."

The court also clarified a prosecution question to William Galloway, whose prior statements to police that he had been asleep and was thus unaware of defendant's whereabouts on the night of the murders were inconsistent with his trial testimony:

"Q. And then in addition to that you claimed not to know where [defendant] was, yet you told this jury you did know where he was. [¶] Which is the truth?

"A. The truth is knowing where he was.

"Q. And in fact, not only did you know where he was but you were with him the entire time after 2 o'clock, weren't you?

"THE COURT: Not necessarily so.

"MR. ROSENBLUM: That's true.

"Q. You were with him most of the time except for when he went into Hanshaw's Liquor?"[8]

The court's very brief involvement did not constitute error. The trial court was authorized to question witnesses by Evidence Code section 775, and the questions here were for purposes of clarification, not advocacy. (*People v. Hawkins* (1995) 10 Cal.4th 920, 948 [42 Cal.Rptr.2d 636, 897 P.2d 574].) Thus, only two comments during the examination of witnesses warrant concern. The first was the court's brief interjection—"So do I"—after prosecution witness Claudia Jones-Marshall stated to defense counsel, "Sir, let me try to answer your question. I hope this is the last time I do have to answer this." Although certain difficulties the prosecution had during the examination of this witness suggests the court's comment might have been directed toward the witness rather than toward defense counsel, the comment was not so disparaging as to have affected the jury's views of the witness or of defense counsel. The second occurred during the prosecution's cross-examination of inmate Robert Laimbeer, who had acknowledged resisting arrest on several occasions. The prosecutor sought to use this evidence to demonstrate bias. When the prosecutor asked, "How many times have you fought with officers?" the court overruled a defense objection that the prosecution had misstated the evidence but then added: "He's taken a position that he's never

---

[8] The court's comment referred to the guilt phase testimony of Felipe Lopez, who testified that he and Galloway had remained in or near the car when defendant went into Hanshaw's Liquor Store.

fought with police officers. He's taken the stance that they've been the aggressor and he's been wrongfully accused and convicted." Although the prosecutor asserted at sidebar that Laimbeer had been convicted of resisting arrest, defendant correctly points out that this offense can be committed without violence. (See *People v. Quiroga* (1993) 16 Cal.App.4th 961, 968–970 [20 Cal.Rptr.2d 446].) Thus, to the extent the court's comment inadvertently suggested that Laimbeer had necessarily been convicted of *fighting* with police officers, it was potentially misleading. However, inasmuch as Laimbeer was properly impeached with numerous felony convictions *and* the jury was instructed not to consider misdemeanor convictions unless they bore on the witness's veracity, defendant could not have been prejudiced. (*People v. Jackson, supra,* 13 Cal.4th at p. 1240 ["There was no reasonable possibility, however, that the jurors would have been swayed by what was, at most, a minor mischaracterization of testimony"].)

The other set of challenged comments occurred during argument of counsel.

The first occurred when the district attorney stated that he had chosen "not to make this a racial case or anything like that, but there's something disturbing about a man who would say don't worry, you're like me, I'm not going to kill you, and then to choose to kill somebody because of the color of their skin. [¶] . . . [¶] That's why I just wanted to call your attention to what is on his tattoo. We believe that is a very racist type of thing. It's his kind. And that, to me, is an aggravating factor, to kill a man because of the color of his skin. He can't help the color of his skin." After defense counsel objected that there was no evidence this was a racist killing, the court overruled the objection as "fair comment on the evidence." We concur in the court's ruling. The comment that defendant made to Gonzalo Chavez as well as defendant's "Puro" tattoo, when combined with the fact that neither murder victim was Hispanic, tended to show that race played a factor in the crimes. The trial court did not err in overruling defendant's objection (see *People v. Quartermain* (1997) 16 Cal.4th 600, 630–631 [66 Cal.Rptr.2d 609, 941 P.2d 788]), nor was it misconduct for the court to state briefly the basis for overruling the objection. The court's observation that the inference was permissible was hardly equivalent to an instruction that it was obligatory.

The remaining comments involved defendant's experts. The district attorney's argument touched on Gayle McGarrity's substantial fee, her history of testifying only for criminal defendants, and her reluctance to share her notes with the prosecution to suggest that her testimony was not credible: "See, what you people probably don't understand, because you haven't been around the system, but there's a whole industry of these defense experts that bounce around from trial to trial, state to state, collecting good money for

testimony. It is a whole industry. They don't just show up here, this isn't the first case. Next week she'll be talking about somebody else." When defense counsel objected to the argument as speculation, the court overruled the objection, again noting that it was "fair comment." The district attorney's characterization of McGarrity's credibility was within the bounds of proper argument. (*People v. Sandoval, supra,* 4 Cal.4th at p. 180; *People v. Frank* (1990) 51 Cal.3d 718, 737 [274 Cal.Rptr. 372, 798 P.2d 1215]; accord, *Jacobs v. Union Pac. R. Co.* (1996) 291 Ill.App.3d 239 [683 N.E.2d 176, 180, 225 Ill.Dec. 232] [" 'opposing counsel may argue to the jury that an expert witness is distorting the truth for financial gain or is a professional witness, if evidence supports the argument' "].) And, although it would have been better if the district attorney had not invoked his own familiarity with the criminal justice system, his statements that McGarrity and other defense experts have testified and will testify in other cases were supported by McGarrity's own testimony and by common sense. (See *Gomez v. State* (Tex.App. 2000) 35 S.W.3d 746, 748 ["Statements of common knowledge are an exception to the rule against arguing facts outside the evidence"].) The trial court thus did not err in overruling the objection.[9] As stated above, it also was not error for the court to state the basis for its ruling.

Finally, we note that the trial court instructed the jury in accordance with CALJIC No. 17.30 that none of the court's statements should be understood to "intimate or suggest what you should find to be the facts . . . or that I believe or disbelieve any witness." Defendant offers no reason to believe the jury failed to follow this instruction. (*People v. Chong, supra,* 76 Cal.App.4th at pp. 244–245.)

 "[I]t is settled that the court need not confine itself to neutral, bland, and colorless summaries, but may focus critically on particular evidence, expressing views about its persuasiveness." (*People v. Rodriguez, supra,* 42 Cal.3d 730, 768.) Whether viewed singly or collectively, the judge's comments in this case did not constitute misconduct. They did not discredit the defense theory, materially distort the record, withdraw material evidence from the jury's consideration, expressly or impliedly direct a verdict, or create an impression that the court had allied itself with the prosecution.

---

[9] The district attorney proceeded, without objection, to make the same point about Norman Morain, the sentencing consultant, and implied, again without objection, that Morain, Lawrence Plon, and Peter Chambers were able to provide opinions helpful to the defense only because the defense had carefully selected the information they received. The prosecutor also suggested that money had also shaped the experts' opinions. Even if defendant had preserved an objection to these characterizations, we would find no error. (*People v. Sandoval, supra,* 4 Cal.4th at p. 180 [no misconduct in calling defense doctor a "liar" during closing argument].)

### E. Alleged Prosecutorial Misconduct

Defendant assigns error to a number of statements by the district attorney during closing argument. These statements, he claims, constituted misconduct (and thereby violated his rights to due process and a reliable penalty determination under the Fifth, Sixth, Eighth and Fourteenth Amendments and the corollary provisions of the California Constitution) in that they suggested the district attorney had personal knowledge of facts not in evidence or that defense counsel had fabricated a defense.

A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44 [104 Cal.Rptr.2d 582, 18 P.3d 11]; accord, *Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464].) In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." (*United States v. Agurs* (1976) 427 U.S. 97, 108 [49 L.Ed.2d 342, 96 S.Ct. 2392].) A prosecutor's conduct " ' "that does not render a criminal trial fundamentally unfair" ' " violates California law " ' "only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Farnam* (2002) 28 Cal.4th 107, 167 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

Even when misconduct has been established, "it 'must bear a reasonable possibility of influencing the penalty verdict. [Citations.] In evaluating a claim of prosecutorial misconduct based upon a prosecutor's comments to the jury, we decide whether there is a reasonable possibility that the jury construed or applied the prosecutor's comments in an objectionable manner.' " (*People v. Valdez* (2004) 32 Cal.4th 73, 132–133 [8 Cal.Rptr.3d 271, 82 P.3d 296].) At the same time, we bear in mind that prosecutors "have wide latitude to discuss and draw inferences from the evidence at trial," and whether "the inferences the prosecutor draws are reasonable is for the jury to decide." (*People v. Dennis* (1998) 17 Cal.4th 468, 522 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)

A defendant must timely object and request a curative instruction in order to preserve a claim of prosecutorial misconduct. (*People v. Valdez, supra*, 32 Cal.4th at p. 132.) Defendant concedes that he failed to object to any of the asserted instances of misconduct, save for the single instance when the prosecutor referred to the defense expert "industry," as discussed above. By failing to make contemporaneous objection to the remaining comments, where the record supports no contention that to do so would have been futile, defendant failed to preserve those claims of prosecutorial misconduct during penalty phase argument. (*People v. Frye* (1998) 18 Cal.4th 894, 970 [77

Cal.Rptr.2d 25, 959 P.2d 183].) Even if the claims had been preserved, none would entitle defendant to relief.

As for the claim that the prosecutor improperly relied on his personal knowledge, defendant first reiterates his challenge to the prosecutor's references to an "industry" of defense experts and his attacks on the credibility of the defense experts. We reject that claim for the reasons stated above in part III.D., *ante*. (See also *People v. Earp* (1999) 20 Cal.4th 826, 862–863 [85 Cal.Rptr.2d 857, 978 P.2d 15].) He also complains that the prosecutor urged the jury to reject defense expert McGarrity's testimony based on his own special knowledge about Guatemala. Defendant misreads the prosecutor's argument, which suggested instead that the conditions McGarrity had identified were not unique to Guatemala and therefore did not diminish defendant's responsibility for his criminal conduct: "Gayle McGarrity; what did she tell you? She said they have problems in Guatemala, she said they have drug and alcohol problems, prostitution problems, and—what was the other one? There were three she mentioned—divorce. Divorce, alcohol, and prostitution problems in Guatemala. [¶] Don't we have those problems here; divorce, alcohol, prostitution? Is the United States so different that we have no crime and this is such a great environment? No. These are things common all over the world. [¶] Guatemala is not a cesspool. There are a lot of very nice, hard-working people that do very well, thank you."

Defendant then claims that the prosecutor invoked his special knowledge to reject defendant's contention that his abuse of alcohol and cocaine before the murders had impaired his judgment. Once again, a review of the prosecutor's comments belies the contention. The prosecutor said: "Ladies and gentlemen, I don't care what Mr. Monterroso claims to drink or smoke or snort, or whatever he had that night, but he knew what he was doing. And the way that I know that is by his conduct. This man wasn't out of it." The prosecutor then listed the acts that demonstrated defendant's awareness—he had ordered the victims to undress and had checked them for weapons; he had fired a warning shot; he had loaded the gun in the kitchen prior to the crimes; and he had stolen a car to make his escape and then "ditched" it down the street. Thus, the prosecutor nowhere suggested he had special knowledge of defendant's condition. He simply stated that he could infer the defendant's state of mind "by his conduct" and then detailed the conduct on which he was relying. This was permissible. (*People v. Medina, supra,* 11 Cal.4th at p. 757.)

Defendant is on somewhat stronger ground when he challenges the prosecutor's use of his personal knowledge to describe the procedures for a guilty plea, for the assignment of prisoners by the Department of Corrections, and for reporting child abuse. The district attorney described the protections afforded to criminal defendants who plead guilty in an attempt to rebut Renae

Alvarez's claim that she did not understand that she had pleaded guilty to vandalizing the Marshalls' van. He described the procedures for assigning prison inmates in an apparent effort to challenge Norman Morain's knowledge of prison practices. And he described the duty of school officials to report child abuse in an apparent effort to challenge defendant's claim that he was beaten daily by his mother and stepfather. The prosecutor's reference to his special knowledge was brief and largely involved collateral matters.[10] Moreover, the jury was instructed that "[s]tatements made by the attorneys during the trial are not evidence." We therefore find no reasonable possibility of a different result if these comments had not been made. (*People v. Valdez, supra,* 32 Cal.4th at p. 134.)

As for defendant's claim that the prosecutor unfairly impugned the integrity of defense counsel, defendant relies on a couple of instances in which the district attorney referred to choices that "they"—meaning the defense—had made. Referring to Jean Brock's testimony that, on the one hand, she had never seen defendant with a gun prior to these crimes and, on the other, that she had told him a number of times to get rid of the gun, the district attorney said: "So which is it? They're presenting a witness to you who is sworn to tell the truth and who is not telling the truth." Then, after discussing the testimony of defendant's father, who had an understandable desire to protect his son, the district attorney said "that's what the defense has attempted to do, is set up fall guys in this case. Set him up as a fall guy, the mother, and the stepfather. They wanted you to think that they're really the ones to blame, not this defendant." Neither instance constituted misconduct. (E.g., *People v. Bemore* (2000) 22 Cal.4th 809, 846–847 [94 Cal.Rptr.2d 840, 996 P.2d 1152]; *People v. Gionis* (1995) 9 Cal.4th 1196, 1216–1218 [40 Cal.Rptr.2d 456, 892 P.2d 1199]; *People v. Breaux* (1991) 1 Cal.4th 281, 305–306 [3 Cal.Rptr.2d 81, 821 P.2d 585].) We also find no misconduct in the prosecutor's commonsense observation that the opinions of the defense experts were necessarily shaped by the information the defense chose to provide them.

Defendant claims the district attorney also attacked defense counsel's integrity in the course of recounting counsel's cross-examination of Nimita Patel, the daughter of murder victim Ashokkumar Patel: "We heard from Nimita who told us she was 12 and a half years old. She's in the seventh grade. And she told us about what her father had meant to her. . . . [¶] And [defense counsel] asked her something which troubled me that night when I went home, and I just want to comment about it. He asked her about her belief in God and if her beliefs helped her with the loss of her father. [¶] And

---

[10] The district attorney also recalled defendant's statement that he was intending to sue Orange County for discharging a fire extinguisher on him at the jail and suggested, since "the statute of limitations is about to run, they better get busy on that." Defendant does not even attempt to explain how he could have been prejudiced by the prosecutor's sarcastic comment.

from the standpoint of somebody asking that outside of a courtroom, I have no problem with that, but in my mind, what I thought was trying to be conveyed is the fact that somehow this defendant should benefit from the comfort that this girl finds in her beliefs in her religion; that somehow her pain of having her father murdered is lessened because she has certain beliefs. And it bothered me. I found it very troublesome that those types of questions would be asked, but I'll just leave it at that. [¶] Because when he killed Mr. Patel, he didn't know about what types of beliefs or if the family was religious. He just killed him because he wanted to."

Evidence that the murder victim's relatives relied on their religious beliefs for comfort relates to the harm caused by the defendant's crimes and was therefore admissible. (*United States v. Bernard* (5th Cir. 2002) 299 F.3d 467, 479.) However, as the instructions made plain, the jury was "free to assign whatever moral or sympathetic value" it deemed appropriate to that evidence. The district attorney's argument sought merely to convince the jury to assign it little weight. (See *People v. Welch* (1999) 20 Cal.4th 701, 760 [85 Cal.Rptr.2d 203, 976 P.2d 754].) His confession that he found the defense argument on this point "troublesome" was likewise within the bounds of permissible prosecutorial argument.

### F. *Alleged Instructional Error*

Defendant claims a number of instructional errors deprived him of his state and federal rights to a fair trial, to due process, to a fair and reliable penalty determination, and to be free from cruel and unusual punishment.

#### 1. *Failure to Instruct That an Absence of Felony Convictions Was a Mitigating Factor*

The jury was instructed in accordance with CALJIC No. 8.85, which provides that in determining the penalty, the jury shall consider, take into account, and be guided by certain enumerated factors, including "[t]he presence or absence of any prior felony conviction, other than the crimes for which the defendant has been tried in the present proceedings." The trial court refused to give defendant's special instruction (Special Instruction No. 11), which provided: "The absence of prior felony convictions is a mitigating circumstance in a capital case, where the accused frequently has had an extensive petty criminal past. [¶] There has been no evidence presented that the defendant has been convicted of any prior felony. This circumstance should therefore be viewed as a circumstance in mitigation." We find no error. "[A] trial court need not instruct that the absence of prior felony convictions is necessarily mitigating," even if the defendant requests such an instruction. (*People v. Pollock* (2004) 32 Cal.4th 1153, 1194 [13

Cal.Rptr.3d 34, 89 P.3d 353].) Indeed, "[w]e have never decided that whether factor (c) [of section 190.3] can only be a factor in aggravation or whether, instead, it can be either aggravating or mitigating. [Citations.] But even if we assume for the sake of argument that factor (c) can be mitigating, nothing in the trial court's instruction here suggested otherwise. . . . Because the *absence* of prior felony convictions by a capital defendant could not be aggravating, the jury would necessarily understand that . . . it could regard the absence of prior felony convictions as mitigating." (*Pollock, supra,* 32 Cal.4th at pp. 1194–1195.)

### 2. *Instructions Concerning Multiple Special Circumstances*

The trial court also refused to give defendant's proposed Special Instruction No. 10, which provided in part: "Although all special circumstances have been found to be true, for purposes of determining the penalty to be imposed, the multiple special circumstances should be considered as one. [¶] You must not consider as an aggravating factor[] the existence of any special circumstance if you have already considered the facts of the special circumstance as a circumstance of the crime for which the defendant has been convicted. In other words, do not consider the same factors more than once in determining the presence of aggravating factors."

 The first part of the instruction—i.e., that the multiple special circumstances should be considered as one—misstated the law. (*People v. Millwee* (1998) 18 Cal.4th 96, 165, fn. 35 [74 Cal.Rptr.2d 418, 954 P.2d 990]; accord, *Spann v. State* (Fla. 2003) 857 So.2d 845, 856–857.) As we have previously explained, a sentencer may legitimately conclude that a death-eligible murderer is more culpable, and hence more deserving of death, if he not only robbed the victim but also committed an additional and separate felonious act, burglary, to facilitate the robbery and murder. (*Ibid.*; accord, *Thomas v. State* (Nev. 2004) 83 P.3d 818, 825; see also *Melton, supra,* 44 Cal.3d at pp. 767–768 [§ 654 is inapplicable].) It does not matter whether the burglary is residential or commercial.

 The second part of the instruction—i.e., that the jury should not double-count the robberies or burglaries, once as circumstances of the murder and again as special circumstances—correctly stated the law. A trial court should, when requested, instruct the jury against double-counting these circumstances. (*Melton, supra,* 44 Cal.3d at p. 768.) However, the trial court's failure to do so here was not prejudicial. The jury was instructed in accordance with CALJIC No. 8.85, which instructed the jury to consider, take into account, and be guided by, inter alia, "the circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true." As we observed in

*Melton*, even without a clarifying instruction, the possibility that a jury would believe it could " 'weigh' each special circumstance twice on the penalty 'scale' " is remote. (*Melton, supra*, 44 Cal.3d at p. 769.) Thus, "in the absence of any misleading argument by the prosecutor or an event demonstrating the substantial likelihood of 'double-counting,' reversal is not required." (*People v. Proctor* (1992) 4 Cal.4th 499, 550 [15 Cal.Rptr.2d 340, 842 P.2d 1100].) In the present case, the prosecutor did not suggest the circumstances of the robberies or the burglaries be considered dually as special circumstances *and* as acts making the murder more heinous. He simply highlighted the facts demonstrating the brutality of the crimes.[11] Moreover, as CALJIC No. 8.85 provided, the jury properly could consider both the facts of each murder as well as the *existence* of the special circumstances—just not the " '*circumstances* of the special circumstances.' " (*People v. Ashmus* (1991) 54 Cal.3d 932, 997 [2 Cal.Rptr.2d 112, 820 P.2d 214].) The jury instructions made that distinction.

### 3. *Instructions Concerning Mental Impairment*

The jury was instructed in accordance with CALJIC No. 8.85, which included the following description of section 190.3, factor (h): "Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication." The trial court refused to append the following paragraph, submitted by defendant as Special Instruction No. 12: "The mental impairment to which this instruction refers is not limited to evidence which excuses the crime or reduces the defendant's culpability but includes any degree of mental defect, disease or intoxication which the jury determines is of a nature that death should not be imposed. [¶] A mental disease or defect may apply to a person diagnosed as having an anti-social personality disorder." We find no error. In addition to factor (h) as given, the jury was instructed under factor (d) to consider whether the defendant "was under the influence of extreme mental or emotional disturbance" at the time the offense was committed and under factor (k) to consider any other circumstance "which extenuates the gravity of the crime even though it is not a legal excuse for the crime [] and any sympathetic or other aspect of the defendant's character or record [that the defendant offers] as a basis" for mitigation." These instructions clearly told the jury it could consider "any mitigating, sympathetic, or extenuating circumstances," including any mental defect, disease, or intoxication. (*People v. Ervin* (2000) 22 Cal.4th 48, 98 [91 Cal.Rptr.2d 623, 990 P.2d 506]; see also *People v. Berryman* (1993) 6 Cal.4th 1048, 1102–1103 [25

---

[11] The prosecutor's suggestion to the jury that defendant had both racial and financial motives for the crimes did not constitute improper double-counting.

Cal.Rptr.2d 867, 864 P.2d 40]; accord, *Boyde v. California* (1990) 494 U.S. 370, 376–377 [108 L.Ed.2d 316, 110 S.Ct. 1190].)

### 4. *Refusal to Give Other Special Instructions*

The trial court refused to give defendant's Special Instruction No. 3, which would have informed the jury that it was free to select a sentence of life without the possibility of parole even if the aggravating factors outweighed the mitigating factors. No such instruction is required. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1135 [12 Cal.Rptr.3d 592, 88 P.3d 498].) Moreover, the instruction was duplicative; other instructions stated that, in order to impose a sentence of death, the jurors must find not only that the aggravating circumstances outweighed the mitigating circumstances, but also that "you personally believe death is the appropriate sentence under all the circumstances."

The trial court also refused two defense instructions focused on sympathy. Defendant's Special Instruction No. 5 provided in relevant part that "[i]f a mitigating circumstance or an aspect of the defendant's background or his character called to the attention of the jury by the evidence or its observation of the defendant arouses sympathy or compassion such as to persuade the jury that death is not the appropriate penalty, the jury may act in response thereto and opt instead for life without the possibility of parole." Defendant's Special Instruction No. 6 provided in relevant part that "[i]t is not only appropriate but necessary that the jury weigh the sympathetic elements of defendant's background against those that may offend the conscience."

To the extent these instructions directed the jury to consider sympathy, they were properly refused as duplicative of instructions that were given. (*People v. Hines, supra*, 15 Cal.4th at pp. 1068–1069.) As stated above, the jury was directed to consider, take into account, and be guided by "any sympathetic or other aspect of the defendant's character or record." In addition, the jury was told to "assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." To the extent defendant's special instructions directed the jury to consider all evidence in mitigation from whatever source, they were again duplicative of other instructions that were given. (*People v. Berryman, supra*, 6 Cal.4th at pp. 1097–1098; *People v. Yeoman* (2003) 31 Cal.4th 93, 155 & fn. 12 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) In addition to the instructions listed above, the jury was told that a "mitigating circumstance is *any* fact condition or event which . . . may be considered as an extenuating circumstance[] in determining the appropriateness of the death penalty." To the extent Special Instruction No. 5 would have directed the jury to consider defendant's demeanor in the courtroom, it too was properly denied as duplicative. The

section 190.3, factor (k) instruction, combined with the other instructions above, was broad enough to encompass jurors' observations of defendant in the courtroom. (*People v. Mayfield, supra,* 14 Cal.4th at p. 808; see also *Berryman, supra,* 6 Cal.4th at pp. 1097–1098.) We therefore reject defendant's claims of error.

### 5. *Instructions Concerning the Weighing of Aggravating and Mitigating Factors*

In *People v. Brown* (1985) 40 Cal.3d 512 [230 Cal.Rptr. 834, 726 P.2d 516], we observed that it would be error to require jurors "to render a death verdict on the basis of some arithmetical formula" or "to impose death on any basis other than their own judgment that such a verdict was appropriate under all the facts and circumstances of the individual case." (*Id.* at p. 540.) The instructions here were consistent with *Brown* in both respects. (See *id.* at p. 545, fn. 19.) The jury was told that the weighing of aggravating and mitigating circumstances "does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them." The jury was also told that "[i]f, in your reasonable judgment you conclude that the aggravating circumstances outweigh the mitigating circumstances and you personally believe death is the appropriate sentence under all the circumstances, then you shall impose death. [In] the event that you cannot so find, you shall impose life without the possibility of parole." There was thus no risk that a juror would have voted for death without also personally determining that death was an appropriate penalty. (*People v. Cox* (2003) 30 Cal.4th 916, 964–965 [135 Cal.Rptr.2d 272, 70 P.3d 277]; *People v. Carpenter* (1997) 15 Cal.4th 312, 419 [63 Cal.Rptr.2d 1, 935 P.2d 708].)

Defendant also argues that the trial court committed reversible error in failing to instruct the jury that it could impose the penalty of death only if it found the aggravating circumstances "so substantial in comparison with the mitigating circumstances that a death verdict is warranted." Although the foregoing derives from CALJIC No. 8.88, its omission was not error. (*People v. Alcala* (1992) 4 Cal.4th 742, 808 [15 Cal.Rptr.2d 432, 842 P.2d 1192].) The other instructions told the jurors that they were "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider"; that they must determine which penalty is justified and appropriate "by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances" and by weighing the totality of the circumstances; and that they could impose death only if they found the aggravating circumstances outweighed the mitigating circumstances *and* they personally believed death was the appropriate sentence under all the circumstances.

### 6. *Instructions Concerning Prior Acts of Force or Violence*

The prosecution alleged seven incidents of unadjudicated criminal activity under section 190.3, factor (b): the implied threat against Susan Selstad on March 8, 1988; the assault against Calvin Marshall on May 25, 1990; the vandalism of the Marshalls' van on May 27, 1990; the fight with rival gang member Leonard Vasquez on November 30, 1989; the assault against David Hall on October 28, 1990; the assault against Deputy Blakely on January 1, 1992; and the threat against Deputy Crisp on May 30, 1993. In accordance with CALJIC No. 8.87, the jury was instructed that "[e]vidence has been introduced for the purpose of showing that the defendant has committed the following acts of violence or threats of force or violence . . . ." The instruction next listed the seven incidents, described as the "implied threat of force or violence" or the "use of force and violence" (or both) against the named victim and the date of the incident. The instruction then cautioned that none of these incidents could be considered as an aggravating circumstance unless the juror was first "satisfied beyond a reasonable doubt that the defendant did in fact commit such criminal acts or activity." The jury was also warned not to consider crimes against property to be an act of violence unless "you determine it to be directly related to a threat of violence upon another." Finally, the jury was told not to consider "any evidence of any other criminal acts or activity as an aggravating circumstance."

Defendant contends that this instruction improperly told the jury that each listed instance of unadjudicated criminal activity actually involved force or violence, thus "removing that issue from the jury's consideration" and constituting "a directed verdict on an essential element of the factor (b) finding the jury was to make." We disagree. In addition to the instructions detailed above, the jury was provided the definition of each alleged crime and possible defenses and reminded as well of the prosecution's burden to establish the commission of each crime beyond a reasonable doubt. These instructions "properly told the jurors that they could consider any of the specified unadjudicated criminal acts as factors in aggravation only if they found beyond a reasonable doubt that defendant had committed the act or activity, and that it involved the use or attempted use or express or implied threat to use force or violence." (*People v. Sapp* (2003) 31 Cal.4th 240, 314 [2 Cal.Rptr.3d 554, 73 P.3d 433].) Except for the vandalism incident, which (as the jury was told) could be used in aggravation only if tied to a threat against another, the characterization of the remaining acts as involving an express or implied use of force or violence, or the threat thereof, would be a matter properly decided by the court. (*People v. Nakahara* (2003) 30 Cal.4th 705, 720 [134 Cal.Rptr.2d 223, 68 P.3d 1190].) "CALJIC No. 8.87 is not invalid for failing to submit to the jury the issue whether the defendant's acts involved the use, attempted use, or threat of force or violence." (*Nakahara, supra*, at p. 720.)

Defendant complains next that there was no limitation placed on the mandate that the jury "consider all of the evidence" received in the case. In particular, he contends, the jury was not told to disregard evidence unfavorable to him if it did not fall within one of the statutory categories of aggravation. The claim is meritless. The instructions stated: "A juror may not consider any evidence of any other criminal acts or activity as an aggravating circumstance." There was thus no risk the jury would have understood the instructions to authorize use of nonstatutory aggravating factors.

Finally, we have repeatedly rejected the contention that jury unanimity is required to establish the truth of unadjudicated crimes. (E.g., *People v. Yeoman, supra*, 31 Cal.4th at p. 164; *People v. Mendoza* (2000) 24 Cal.4th 130, 189 [99 Cal.Rptr.2d 485, 6 P.3d 150].)

### G. *Denial of the Motion for Modification of the Verdict*

Defendant contends the trial court prejudged defendant's section 190.4, subdivision (e) motion for modification of the verdict and thereby deprived him of rights secured by the Fifth, Sixth, Eighth, and Fourteenth Amendments and their state analogues. The sole basis for this claim is the trial court's failure expressly to mention the motion for modification in response to a juror's postverdict inquiry into the *appellate* process. We find no error.

After the verdict was announced, the trial judge, as was his usual practice, invited the jurors into chambers to relax before making a decision whether to speak to the attorneys or the press. During the in-chambers question-and-answer session, one juror asked the judge, "I just was curious. What happens now in terms of is it automatically appealed?" The court replied as follows: "Pretty much everything is automatic. There's an automatic motion for new trial that is conducted. If the court grants a new trial, for one reason I might have fouled up during the course of the trial myself and I would have to give a new trial, it would be done over again. If the motion for new trial is not granted then he is sentenced by the court; and then from there on that is automatic. [¶] In other words, the appellate process goes right straight to the Supreme Court of California. If he wins there the trial is done again. If it's not, then it's automatically sent to the United States Supreme Court. If he wins there the case is either done over, down graded, or something of that nature. If he doesn't win any of these kinds of appellate process or a series of what we call writ attacks, in other words things that were done in the

background that aren't a matter of record, could also result in the case not resulting in death. But if all of that fails, then ultimately the man gets executed."

Nothing in the foregoing constituted, as defendant puts it, the judge's premature "announce[ment] that he would deny any motion to modify the death verdict." The juror's question addressed only the appellate process. That the court focused its answer on the appellate process and gave only an abbreviated and incomplete description of the steps before that process could commence was hardly improper. Moreover, the court's comments in denying the motion for modification reveal that it had reviewed its notes, the transcripts, and the exhibits before finding that the evidence of defendant's guilt was "overwhelming." The court recited both the facts of the crimes and the penalty phase evidence and concluded that the aggravating factors "overwhelmingly" outweighed the mitigating factors. The record thus demonstrates that the trial court conscientiously discharged its duty. Tellingly, defendant nowhere claims that the denial of the motion was an abuse of discretion.

Finally, it would appear that the court's reference to an "automatic motion for new trial" in response to the juror's inquiry must have contemplated the automatic motion for modification of the verdict under section 190.4, subdivision (e), since it is the only "automatic" postverdict motion. (See also *People v. Allison* (1989) 48 Cal.3d 879, 915 [258 Cal.Rptr. 208, 771 P.2d 1294] [harmonizing section 190.4, subdivision (e) with section 1181, subdivision (7)].) The court was not required to use a particular nomenclature in an informal postverdict "debriefing" with the jurors on pain of being found to have prejudged the automatic motion for modification.

## H. *Constitutionality of California's Death Penalty Statute*

Defendant contends that various features of California's death penalty statute violate the Fifth, Sixth, and Eighth Amendments and the equal protection clause of the Fourteenth Amendment to the federal Constitution. We have repeatedly rejected defendant's claims in prior decisions, and defendant's argument offers no grounds for reconsidering these holdings.

Thus, we reject defendant's claim that the death penalty law is unconstitutional by failing to adequately narrow the class of death-eligible offenders (*People v. Prieto, supra*, 30 Cal.4th at p. 276) or require written findings (*People v. Jenkins* (2000) 22 Cal.4th 900, 1053 [95 Cal.Rptr.2d 377, 997 P.2d 1044]); by failing to provide meaningful intercase or intracase

proportionality review (*People v. Martinez* (2003) 31 Cal.4th 673, 703 [3 Cal.Rptr.3d 648, 74 P.3d 748]; *Prieto, supra*, 30 Cal.4th at p. 276); by failing to identify which factors are aggravating and which are mitigating (*People v. Catlin* (2001) 26 Cal.4th 81, 178 [109 Cal.Rptr.2d 31, 26 P.3d 357]); and by failing to delete inapplicable mitigating factors (*People v. Maury* (2003) 30 Cal.4th 342, 439–440 [133 Cal.Rptr.2d 561, 68 P.3d 1]). We also reject defendant's claims that the sentencing instructions were unconstitutionally vague (*id.* at p. 440); that the qualifiers "extreme," "substantial," "reasonably," or "moral" in section 190.3, factors (d), (f), and (g) prevented jury consideration of relevant mitigating evidence (*People v. Bolden* (2002) 29 Cal.4th 515, 566 [127 Cal.Rptr.2d 802, 58 P.3d 931]; cf. § 190.3, factor (k)); that the death penalty law is constitutionally deficient because the prosecution retains discretion whether to seek the death penalty (*People v. Koontz* (2002) 27 Cal.4th 1041, 1095 [119 Cal.Rptr.2d 859, 46 P.3d 335]); that the jury should have been instructed that a sentence of life without the possibility of parole means that defendant could not be considered for parole (*People v. Navarette, supra*, 30 Cal.4th at p. 521); and that the law improperly permits the jury to aggravate the sentence based on circumstances that should only be mitigating (*People v. Holt, supra*, 15 Cal.4th at p. 701).

■■■ We also conclude there is no constitutional requirement that the jury be instructed concerning the burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence, and no requirement that the jury achieve unanimity as to the aggravating circumstances. (*People v. Jenkins, supra*, 22 Cal.4th at pp. 1053–1054.) Recent United States Supreme Court decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] have not altered our conclusions regarding the burden of proof or jury unanimity. (See *People v. Prieto, supra*, 30 Cal.4th at pp. 263, 275.)

## I. *Cumulative Error*

Defendant argues that the cumulative effect of the errors at his penalty trial requires reversal of his sentence of death. We disagree. The few individual errors we have found are no more compelling when considered in combination. Their cumulative effect does not warrant reversal of the judgment.

## IV. DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied February 16, 2005.