Filed 7/11/16  P. v. Simpson CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E063049 |
| v. | (Super.Ct.No. FMB1300626) |
| TOREY DESHAUN SIMPSON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Rodney A. Cortez, Judge.  Affirmed as modified.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., Randall Einhorn and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

1

On October 18, 2013, the victim went to the apartment of a friend. When the victim arrived at the apartment, defendant and appellant Torey Deshaun Simpson ambushed him outside the apartment and shot him. Defendant then forced Tiffany Orona to drive him away from the scene, threatening to kill her and her children if she spoke to the police. The victim sustained 10 gunshot wounds and died at the hospital. Defendant was convicted of first degree murder with an enhancement for personal gun use causing death or great bodily injury, dissuading a witness from reporting a crime, and making terrorist threats. Defendant makes the following claims on appeal:

1. The trial court committed reversible error when it failed to instruct the jury pursuant to CALCRIM Nos. 334 or 335 that one of the witnesses who testified was an accomplice.

2. The trial court erroneously admitted the victim's statement identifying defendant as the shooter as a dying declaration pursuant to Evidence Code section 1242.

3. The sentence on his conviction of making terrorist threats must be stayed pursuant to Penal Code section 654.[1]

## FACTUAL AND PROCEDURAL HISTORY

A. <u>PROCEDURAL HISTORY</u>

Defendant was found guilty of first degree murder (§ 187; count 1). In addition, he was found guilty of dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1); count 2), and of making criminal threats (§ 422, subd. (a); count 3). The jury also found

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

true the allegation that he personally and intentionally discharged a firearm, which proximately caused death to the victim (§ 12022.53, subds. (b), (c) & (d)). Defendant admitted he suffered one prior conviction, for which he served a prior prison term (§ 667.5, subd. (b)).

Defendant was sentenced to 25 years to life on count 1, plus a consecutive 25-years-to-life sentence for the gun-use enhancement. In addition, the trial court imposed a consecutive three-year sentence on count 2, plus one year for the prior conviction, for a total of four years. The trial court ordered a two-year sentence on count 3, which was to run concurrent to count 2. Defendant received a total sentence of 50 years to life plus four years.[2]

B.    FACTUAL HISTORY

1.    *THE SHOOTING*

On October 18, 2013, Overa Lightfoot was living with her husband (the victim) and her eight children in Twentynine Palms. That evening, Overa[3] had cooked dinner at their house. The victim received a call from Jerry Jackson and they argued on the phone about money Jerry owed to the victim. The victim had Overa drive him to Jerry's apartment, located at the Twentynine Palms building.

---

[2] Defendant had been charged in the Information with having suffered several prior convictions under section 667.5, subdivision (b). The trial court struck the other prior convictions at the time of sentencing.

[3] Several of the witnesses share the same last name. We refer to these witnesses by their first names not out of disrespect but in order to avoid any confusion.

When they arrived at Jerry's house, the porch light was off; Jerry always kept the porch light on. Overa stayed in the car while the victim went to the door. The victim knocked on the door but Jerry did not answer. A man approached the victim from behind holding a small black gun. He said to the victim, "[N-word] I gotcha now." The victim turned around and said, "What?" The victim pulled up his shirt to show that he did not have a gun.

Overa recognized the man's voice as belonging to defendant. Defendant was wearing a red shirt and jeans. Defendant then shot the victim. The victim tried to dodge the bullets but defendant moved closer and shot him additional times. Overa estimated defendant shot at the victim nine times.

Defendant appeared to run out of bullets. He looked up and saw Overa in the car. He ran away. The victim fell through the front door of the Jacksons' apartment. The victim was grabbing his stomach. Overa ran to him. She asked him who had shot him. He responded, "[N-word] 'T' over there. That [N-word] 'T' did it." Overa knew defendant as T. Jerry's wife, Leilani May Jackson, called 911.

Jerry leaned down and rubbed the victim's back. The victim accused Jerry of setting him up. The victim said, "I'm coming back for you when I come out of this." The victim had been shot in both legs, both arms and his abdomen. He was bleeding from all of these areas and his mouth.

Overa went outside and called her sister. Jerry also came outside and it appeared to Overa he was doing something on his cellular telephone. While Leilani was on the phone with the 911 operator Overa told Leilani defendant had shot the victim.

Defendant had previously confronted the victim and accused him of being a snitch. Additionally, defendant's family had confronted the victim on two prior occasions. Overa had previously seen defendant and his family at the Jacksons' apartment. Overa was scared to testify because she was worried defendant's family would hurt her. Overa denied she started seeing someone just a few months after her husband was killed. A life insurance policy in the amount of $70,000 had been purchased for the victim six months prior to his murder; Overa was the beneficiary.

Diana Fielding lived in the Twentynine Palms Apartments. On the evening of October 18, Fielding walked from her apartment to her daughter's apartment, which was also in the complex. On her way, she noticed a black SUV with tinted windows in the parking lot; two people were inside. When she came back from her daughter's apartment, about 15 to 20 minutes later, they were still sitting in the SUV.

Fielding had her screen door open and could see out. She could see the passenger in the SUV. She then heard several gunshots; she dropped to the floor. The SUV took off a few minutes later. She did not think the passenger or driver got out of the SUV but she could not see the back doors.

Leilani did not want to testify. She lived with Jerry and their daughter. Defendant was a good friend that she had known for eight years; she had heard him called T. Leilani was also friends with the victim. The victim had helped Leilani and Jerry by giving them money when Jerry had surgery. Defendant was at their apartment around 2:40 p.m. on the day of the shooting. Their daughter was staying at a neighbor's house that evening.

5

Leilani was watching television in her bedroom when she heard what she thought was knocking on the front door. She thought it was her daughter so she and Jerry went to the door. Leilani then realized it was gunshots and Jerry forced her to the ground. They heard more gunshots. She thought her daughter was being shot. She immediately called 911.

While she was on the floor, the front door opened and the victim fell into the house. She heard him say, "they set me up." She heard the victim say to Jerry, "Please don't let me die." Leilani ran out to find her daughter. Leilani ran to the neighbor who had her daughter and her daughter was safe; Leilani asked her neighbor to keep her daughter. Leilani claimed when she ran out, Overa was still in her car texting someone. When she ran back, Overa was still in her car. Overa came in the house a few seconds later but did not seem upset.

Overa told Leilani that T shot her husband but Leilani insisted at trial she knew several persons named T. She heard the victim say that T shot him; he never said defendant's name. Leilani denied she told the police T was seeing a girl with whom the victim had been having sex.

Jerry met defendant in 2006. He never called defendant T but had heard him called that; he also knew other people who had that name. He had also known the victim for eight to nine years.

Jerry saw the victim at a gas station earlier in the day and made a deal that he would sell the victim some codeine cough syrup. Jerry told the victim he could not have it for free in exchange for a loan the victim had made to Leilani while Jerry was in the

6

hospital six or seven years prior. Jerry spoke with defendant around 4:00 p.m. because defendant was supposed to bring him some "weed." Later, Jerry and the victim argued over the phone. Jerry told him to come to the apartment to discuss the loan and the cough syrup.

There was a knock on the door and Jerry believed it was their daughter. He then heard gunshots. He got to the door and heard the victim screaming for his life, begging the other person not to shoot him. Jerry opened the door and the victim fell in. Leilani immediately ran out to check on their daughter. Jerry called 911; the call was made at 7:14 p.m. Jerry reported that a shooting had happened just outside his door and that the victim fell into his apartment. Jerry reported, "He-he-he's about to go." The victim told Jerry to help him and not to let him die. Jerry believed that the victim was about to die.

Jerry claimed Overa came into the apartment about 15 to 20 minutes after the victim was shot. Overa did not seem concerned about the victim being shot. Overa did not comfort the victim.

Brandie Johnson lived in the Twentynine Palms Apartments. She lived with her two children. Johnson testified she knew defendant but did not know that he went by the nickname T; she admitted she had previously stated she knew defendant as T. In October 2013 she purchased marijuana from defendant four or five times each day. She was in her apartment the night of the shooting. When she heard the shots, she got her children to a safe place in her apartment and waited. She went outside 15 minutes later. She talked to defendant after the shooting, but she insisted it was only about her "weed."

7

## 2. *DEFENDANT'S ESCAPE*

Tiffany Orona lived on Sun Valley Drive in Twentynine Palms on October 18, with several of her children. Orona had met defendant and his family at neighborhood barbecues. That evening, around 6:30 p.m., she was in the backyard smoking a cigarette when she heard gunshots. They sounded close. About 10 to 15 minutes later, defendant showed up at her house. Defendant told Orona he needed a ride. He was wearing jeans and a white tank top. Orona told him she could not leave the kids alone but he persisted that he needed a ride. She asked him why he needed a ride. Defendant got angry and said, "Bitch, don't ask questions."

Orona grabbed her purse from her bedroom. Defendant was waiting for her in the garage and was holding a black garbage bag. It looked like the type of bag she kept under her sink. At the top of the bag, she saw some type of red clothing. Defendant directed her to drive in a direction away from the shooting. He squeezed her shoulder to direct her.

During the ride, defendant made and received several phone calls on his cellular telephone. During one phone call, she heard there was an "APB" put out on a SUV. Defendant then called "Doobie," who Orona knew as Shun Young. Defendant asked Doobie if he had gotten rid of the vehicle. Orona was scared. Orona started crying because she was worried he would hurt her. Orona tried to look at defendant's cellular telephone to see what he was texting, but defendant told her not to "fuckin" look at him.

8

Defendant had Orona drive him to a nearby college so defendant's dad could pick him up. She parked in the parking lot at the school. Defendant got out of the car and Orona asked if she could leave. Defendant reached through the driver's side window and pulled the back of Orona's head and shoulders. He pulled her toward him and told her to keep her mouth shut. He told her that if she said anything, he would have her and her children killed. He said there would be people watching her and her children. Defendant told her that he would make sure her kids were killed first so that she would suffer before she was killed. Orona asked him why he did it. He responded she should mind her own "fuckin" business. Defendant's dad arrived five or 10 minutes later.

Orona thought about immediately calling the police but was too scared defendant would find out and hurt her and her children. Orona found out the victim had been killed the following morning. Orona was scared and did not leave her house the entire weekend.

### 3. *POLICE INVESTIGATION*

San Bernardino County Sheriff's Deputy Ericson Dominick received a call that a person had been shot at the Twentynine Palms Apartment. When he arrived, Leilani was on her cellular telephone in the parking lot and waved at him to get his attention. There were several spent shell casings near the door to the Jacksons' apartment. There was blood splatter everywhere near the front door. He then saw the victim laying on the floor about three feet from the front door inside the apartment. He had blood all over his clothes. He had apparent gunshot wounds on his arm and leg. Overa was standing near the victim.

9

Overa told Deputy Dominick that a light skinned Black male wearing a red shirt had shot the victim. Deputy Dominick then asked the victim if he knew who shot him. The victim was in pain, grabbing his chest and leg areas. He was having difficulty breathing. The victim responded, "It was . . . it was . . ." and then he vomited on the floor. At that point, paramedics arrived. Overa told Deputy Dominick it was T who shot the victim. Overa never told Deputy Dominick she recognized defendant's voice. Deputy Dominick did notice that Overa did not seem very emotional or upset with regards to the shooting.

San Bernardino County Sheriff's Detective Marcel Silva responded to investigate the shooting. He located several shell casings outside the apartment occupied by the Jacksons. Blood splatter was found on the rug by the front door to the apartment. Detective Silva also found several bullet fragments.

Detective Silva interviewed Jerry at his apartment. Detective Silva asked for Jerry's cellular telephone calls but Jerry told him he had erased them from his phone. Jerry insisted it was his common practice to erase them from his phone. Jerry never disclosed that he called defendant shortly before the murder.

San Bernardino County Sheriff's Detective Edward Bachman subpoenaed the phone records for defendant, the victim, Young, defendant's dad, Johnson and Jerry. Numerous short calls were made between Jerry and the victim between 6:47 and 7:04 p.m. on October 18. Ten minutes later there was a call made to 911 from Jerry's phone.

10

Defendant's phone records showed that around 4:00 p.m., he called Jerry. There were additional calls at 6:37, 6:46, 6:56, and 6:59 p.m. Jerry called defendant at 11:37 p.m. Defendant called him back a few seconds later. There were several other calls made by Jerry to defendant that lasted for a few seconds on the following day.

There were phone calls between defendant and Young. Defendant called Young at 6:27 p.m. He called him again several times between 7:21 p.m. and 11:30 a.m. the following morning. There were phone calls between defendant and his father at 5:09, 7:30, 7:36, and 7:42 p.m. Johnson also had contact with defendant.

San Bernardino County Sheriff's Detective Stan Wijnhamer interviewed Overa on October 20 at 12:45 a.m. She was scared and upset. Overa asked to be relocated. She told Detective Wijnhamer defendant had shot her husband. She referred to him as T. She told the Detective she recognized defendant's voice. She asked her husband who shot him just to make sure. She identified defendant as the person she knew as T from a photographic lineup.

San Bernardino County Sheriff's Detective Jose Avila received a tip that Orona may have information about the shooting. He interviewed her on October 25. Orona initially said nothing about driving defendant because she was afraid defendant was tapping her phone. After Detective Avila confronted her that he had information she had driven defendant, she admitted she drove him to the college. Orona contacted him on October 28, and told him she had not been completely honest with him. She was in fear of her life and her family's life.

11

Detective Avila interviewed Orona at her house. She was visibly upset and crying. She did not want him to leave. She recounted how defendant had threatened her. She identified Young from a photographic lineup. She knew him as "Doobie." She stated that Young drove a large black SUV.

Detective Avila interviewed Leilani. She repeatedly referred to defendant as T. She admitted overhearing Overa say T had shot the victim. Detective Avila also spoke with Johnson. She admitted that she spoke to T, who she identified as defendant, that night.

An autopsy was performed on the victim. The victim had suffered 10 gunshot wounds, some from the same bullet entering and exiting his body. A bullet was recovered from his lower right back.

The defense testimony all pertained to the charges involving Orona, which is not relevant to the issues raised on appeal.

## DISCUSSION

### A. ACCOMPLICE TESTIMONY

Defendant contends Young was an accomplice as a matter of law and the trial court was required to instruct the jury with CALCRIM No. 335, that Young's testimony should be viewed with distrust and must be corroborated. In the alternative, defendant argues at the very least the jury should have been instructed with CALCRIM No. 334, that it could consider whether Young was an accomplice, and if they reached that conclusion, his testimony must be corroborated.

## 1.    *ADDITIONAL FACTUAL BACKGROUND*

At trial, Young testified he did not recall speaking with the police about the victim's murder.  He also claimed he could not read so he could not review the transcripts of the interviews.  Even after the recording was played for Young, he could not remember the conversation with the police.  He denied he recognized his voice on the tapes.  A person read the transcripts to Young.

Young only admitted he had been dating a girl named Michelle on October 18.  She drove a green Nissan.  He denied she drove a black SUV and he did not recall telling police she drove a SUV even after having been read the police interview.  He did not recall telling the police (1) he went to see Johnson the day of the murder; (2) he had a relationship with Johnson; (3) on the day of the murder Johnson called him and asked him for marijuana, and he was with T when she called; (4) he did not know a person named T.  He was able to identify defendant in court only because he had seen him "around."  However, he denied that he knew anything about a shooting that day.  He denied he said he was in Johnson's apartment on the day of the shooting.  He never told the police defendant was mad at the victim.

Outside the presence of the jury, the trial court noted Young clearly did not want to testify and had refused to answer questions.  His lack of memory was an evasion.  Under Evidence Code section 770, the trial court would allow in his prior inconsistent statements for impeachment.

13

Detective Wijnhamer testified he interviewed Young on January 21, 2014, and Young had no difficulty remembering the events the night of the shooting. Young acknowledged he had been dating Michelle and she drove a large, black SUV. On October 18, 2013, Young was at the Twentynine Palms Apartment visiting Johnson. Young told Detective Wijnhamer he drove defendant in the SUV to the Twentynine Palms Apartments to sell marijuana to Johnson. Young referred to defendant as T throughout the interview.

When they arrived, they parked the SUV near Johnson's apartment. Young went inside to smoke marijuana with Johnson and defendant left the apartment. While defendant was gone and Young was still inside Johnson's apartment, Young heard two gunshots; he got scared. He went back to the SUV and drove off. Later, Young called defendant to make sure he was okay. Defendant told him he was fine. Young told Detective Wijnhamer defendant was angry with the victim because they were involved with the same female. The victim had called the police on defendant and defendant ended up going to jail.

2. *ACCOMPLICE INSTRUCTIONS*

Section 1111 defines an accomplice "as one who is liable to prosecution for the identical offense charged against the defendant. . . ." The section further provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." " " "[A]n accomplice is one who aids or promotes

14

the perpetrator's crime with knowledge of the perpetrator's unlawful purpose and an intent to assist in the commission of the target crime. . . ." [Citation.] "In order to be an accomplice, the witness must be chargeable with the crime as a principal (§ 31) and not merely as an accessory after the fact (§§ 32, 33)."'" (*People v. Bryant* (2014) 60 Cal.4th 335, 429.)

"'"'[W]henever the testimony given upon the trial is sufficient to warrant the conclusion upon the part of the jury that a witness implicating a defendant was an accomplice,'" the trial court must instruct the jury, sua sponte, to determine whether the witness was an accomplice. [Citation.] If the testimony establishes that the witness was an accomplice as a matter of law, the jury must be so instructed. [Citation.] In either case, the trial court also must instruct the jury, sua sponte, '(1) that the testimony of the accomplice witness is to be viewed with distrust [citations], and (2) that the defendant cannot be convicted on the basis of the accomplice's testimony unless it is corroborated.'" (*People v. Zapien* (1993) 4 Cal.4th 929, 982.)

Here, there was "scant and conflicting evidence" that Young was an accomplice. (*People v. Bryant*, *supra*, 60 Cal.4th at p. 432.) Young denied any memory of the events of the night at trial. When he was interviewed by Detective Wijnhamer prior to trial, he admitted he had driven defendant to the Twentynine Palms Apartments that night. He insisted it was so defendant could sell marijuana to Johnson. Young stated that he had been in Johnson's apartment when the shots were fired and immediately left in the SUV without defendant. He later called defendant to make sure he was okay. Other evidence

15

showed there were several phone calls made to Young by defendant.  Finally, Orona testified she overheard defendant talking to Young about getting rid of the SUV.

None of this evidence established by a preponderance of the evidence that Young was subject to the prosecution for the identical offense charged against defendant. (*People v. Hinton* (2006) 37 Cal.4th 839, 879 [evidence a person is an accomplice must be shown by a preponderance of the evidence].)  At most, the evidence presented to the jury established Young was an accessory after the fact.  This did not establish Young had knowledge of defendant's unlawful purpose and he intended to assist in the commission of the target crime.  Accomplice instructions were not warranted based on the evidence.

"Nonetheless, 'the failure to instruct on accomplice testimony pursuant to section 1111 is harmless where there is sufficient corroborating evidence in the record. [Citations.]  The requisite corroboration may be established entirely by circumstantial evidence.  [Citations.]  Such evidence "may be slight and entitled to little consideration when standing alone.  [Citations.]"' [Citation.]  'Corroborating evidence "must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged."''' (*People v. Zapien*, *supra*, 4 Cal.4th at p. 982; see also *People v. Hayes* (1999) 21 Cal.4th 1211, 1271.)

Here, there was ample corroborating evidence defendant was at the Twentynine Palms Apartments that night.  Overa saw defendant and recognized his voice.  The victim confirmed he was shot by T.  Fielding, who lived near the Jacksons, confirmed she saw a black SUV at the apartments just prior to the shooting.  Defendant forced Orona, who

16

lived close to the shooting, to drive him away from the area. When she asked why he needed a ride, he told her not to ask any questions. Further, he threatened her that he would kill her and her children if she told anyone she had driven him that night. Phone records also confirmed defendant was in contact with Young that night.

Based on the foregoing, even had the jury been instructed that Young was an accomplice, there was ample corroborating evidence establishing that defendant shot the victim. As such, any conceivable error was harmless.

B. DYING DECLARATION

Defendant contends the trial court erred by admitting the victim's statement that T was the shooter, as it did not qualify as a dying declaration. He insists the victim believed he was going to survive at the time he made the statement.

1. *ADDITIONAL FACTUAL BACKGROUND*

Prior to trial, the People filed a trial brief in which they sought to admit the statement made by the victim that "T" shot him. The People argued pursuant to Evidence Code section 1242, this was a dying declaration. The trial court heard the matter prior to trial. The People argued the victim was shot six times and fell into Jerry's apartment and told him, "Don't let me die. Don't let me die." The victim was holding onto his abdomen and groaning. He was overheard to say that T was the shooter. When Deputy Dominick arrived, he asked the victim who had shot him. He said, "It was . . . it was . . ." and then turned over to his side and vomited. The victim lost consciousness on the way to the hospital. He woke up one time and only said he was dying. He died the next day after surgery.

17

The trial court reviewed the language in Evidence Code section 1242. Based on the information provided to the trial court, it found it appeared the exception applied as the victim believed his death was just a matter of time.

### 2. *ANALYSIS*

"'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) An established exception to the hearsay rule is a dying declaration. Evidence Code section 1242 provides, "Evidence of a statement made by a dying person respecting the cause and circumstances of his death is not made inadmissible by the hearsay rule if the statement was made upon his personal knowledge and under a sense of immediately impending death."

""""This sense of impending death may be shown in any satisfactory mode, by the express language of the declarant, or be inspired from his evident danger, or the opinions of medical or other attendants stated to him, or from his conduct, or other circumstances in the case, all of which are resorted to in order to ascertain the state of the declarant's mind."""" (*People v. Monterroso* (2004) 34 Cal.4th 743, 763.) In *Monterroso*, the prosecutor in seeking to admit a statement by the victim who shot him, "relied on the declarant's statements, demeanor, and conduct, as well as his evident injuries. The gunshot pierced [the victim]'s respiratory system, his gastrointestinal system, and his liver. The chest wound and the liver damage were each 'of a great magnitude and dangerous in itself.'" (*Id*. at p. 763.) Further, an officer testified that at the time the statements were made, the victim "knew he had been shot, was in great pain and on the

18

ground in a fetal position, was fearful of dying, and never spoke again." (*Ibid.*)

Therefore, the court in *Monterroso* concluded the statements were properly admitted as dying declarations, even though the victim lingered for several days before dying. (*Ibid.*)

This case is similar to *People v. Black* (1979) 96 Cal.App.3d 846. In *Black* the defendant shot the victim two or three times. When a responding officer arrived, the victim's first words were that he did not want to die. The victim then told the officer the name of the person who had shot him and continued to tell the officer not to let him die. The appellate court found the statement was properly admitted as a dying declaration. (*Id.* at p. 851.) It found, "At the time [the victim] made his statements in question, he was dying. Furthermore, it is apparent that [the victim] had knowledge of his critical condition which prompted him to plea emotionally to [the officer] not to let him die. Whether [the victim] thought he was recovering at the time he was in the hospital, as appellant contends, does not affect the veracity of his statement made while under the sense of impending death." (*Id.* at pp. 851-852.)

A trial court's ruling on the admissibility of a statement as a dying declaration is subject to review under the abuse of discretion standard. (*People v. Mayo* (2006) 140 Cal.App.4th 535, 553; see also *People v. Monterroso*, *supra,* 34 Cal.4th at p. 763.)

Here, the victim had suffered 10 gunshot wounds. He had wounds on his legs, arms and abdomen. He was grabbing his stomach. He was bleeding from all the wounds and his mouth. He begged with Jerry not to let him die. The People established the severity of the victim's wounds and that he was aware of the severity by declaring he did

19

not want to die.  The trial court did not abuse its discretion by admitting the statement under the exception for dying declarations.

Defendant relies on one statement made by the victim to show he did not believe that he was dying.  The victim accused Jerry of setting him up and stated when he came "out of this" he was going to get him back.  Based on the totality of the circumstances, this one statement did not negate that the victim's injuries were severe and that he also said he did not want to die.  The statement was properly admitted.

Moreover, even if the statement was erroneously admitted, such error was harmless as it is not reasonably probable defendant would have received a more favorable verdict had the victim's statement been excluded.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  As stated in detail *ante*, Overa saw defendant shoot the victim, defendant forced Orona to drive him away from the area and threatened her not to tell anyone, and defendant was in contact with all of the parties involved that night.  This evidence clearly established defendant shot the victim even without the victim's statement.

C.    SECTION 654

Defendant insists the trial court should have stayed his sentence of two years on count 3, his conviction for making terrorist threats, because it was based on the same conduct as count 2, the dissuading a witness charge, for which he was given a three-year sentence.  The People concede the sentencing error.

At the time of sentencing, the trial court imposed a sentence of three years for the dissuading a witness (Orona) conviction in count 2.  In addition, the trial court imposed a

20

concurrent sentence of two years on count 3, the making of terrorist threats against Orona.

Section 654 provides, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." "The purpose of section 654 is to prevent multiple punishment for a single act or omission, even though that act or omission violates more than one statute and thus constitutes more than one crime. Although the distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, the trial court may impose sentence for only one offense—the one carrying the highest punishment." (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1134.)

It is clear the two convictions arose from the same conduct. During closing argument, the prosecutor contended that the dissuading a witness and making criminal threats charges pertained to the same conduct by defendant: grabbing Orona by the back of her head and threatening her and her family if she called the police. Accordingly, the concurrent sentence imposed for making a terrorist threat in count 3 must be stayed. (*People v. Spirlin* (2000) 81 Cal.App.4th 119, 131 [the proper procedure for disposing of a term that violates section 654 is to impose and stay sentence on the lesser term].)

**DISPOSITION**

Defendant's sentence for count 3 is modified to reflect that the sentence is stayed, pursuant to section 654. The trial court is directed to amend the abstract of judgment so as to reflect the modification and to forward a certified copy of the amended abstract of

21

judgment to the Department of Corrections and Rehabilitation.  (§§ 1213, 1216.)  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

J.

We concur:

McKINSTER

Acting P. J.

CODRINGTON

J.